Argued and submitted October 28, 2004, reversed and remanded with instructions to enter summary judgment for defendant Homecomings Financial Network; judgment of dismissal against defendant Cal-Western Reconveyance Corporation vacated and remanded December 6, 2006

## STAFFORDSHIRE INVESTMENTS, INC.,
an Oregon corporation,
*Respondent - Cross-Appellant,*

*v.*

## CAL-WESTERN RECONVEYANCE CORPORATION,
a California corporation,
*Cross-Respondent,*

*and*

## BANKERS TRUST COMPANY OF CALIFORNIA, N.A.,
a national banking association,
*Defendant,*

*and*

## HOMECOMINGS FINANCIAL NETWORK,
a Delaware corporation,
*Appellant - Cross-Respondent.*

0204-03942; A121664

149 P3d 150

Peter Salmon argued the cause for appellant - cross-respondent and cross-respondent Cal-Western Reconveyance Corporation. On the briefs were David E. McAllister and Moss Pite & Duncan, LLP.

James N. Esterkin argued the cause and filed the brief for respondent - cross-appellant.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendant Homecomings Financial Network appeals from a judgment for plaintiff on plaintiff's claim for breach of contract.[1] Defendant assigns error to the trial court's grant of summary judgment in plaintiff's favor on its breach of contract claim and to the denial of defendant's motion for summary judgment on that claim. Plaintiff cross-appeals from the trial court's dismissal of its claim against Cal-Western Reconveyance Corporation (Cal-Western) for breach of warranty of authority. On appeal, we reverse the judgment in favor of plaintiff and remand with instructions to enter judgment for defendant; on the cross-appeal, we vacate and remand.

When a trial court grants a motion for summary judgment and denies a cross-motion for summary judgment, and the party assigns error to both rulings, we can review both rulings on appeal. *Eden Gate, Inc. v. D & L Excavating and Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002). We review the record to determine if there are genuine issues of material fact and, if there are none, we decide which party is entitled to judgment as a matter of law, viewing the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the party opposing the motion. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997); *Powell v. Bunn*, 185 Or App 334, 338, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003).

Bickell mortgaged a property to Headlands Mortgage Company (Headlands) on July 9, 1999. At that time, Rainey was a cotrustee of Bickell's living trust and had a power of attorney from Bickell to act on her behalf in financial transactions. The loan was secured by a trust deed that provided for the foreclosure sale of the property in the event of default by the grantor. Headlands was designated as the beneficiary of the trust, and Chicago Trust was the trustee.

---

[1] Defendant Cal-Western Reconveyance Corporation did not appeal the judgment. However, it is the cross-respondent in plaintiff's cross-appeal. We will refer to Homecomings Financial Network as defendant and Cal-Western Reconveyance Corporation as Cal-Western. Defendant Bankers Trust Company of California, N.A., is not a party to this appeal.

Headlands assigned its interest under the trust deed to Bankers Trust Company of California, N.A. (Bankers Trust), on March 27, 2000. Defendant serviced the loan for Bankers Trust. In January 2001, Bickell defaulted on her loan. Based on that default, Bankers Trust initiated a nonjudicial foreclosure sale of the property. Cal-Western was substituted for Chicago Trust as trustee for purposes of the foreclosure sale. Cal-Western recorded a notice of default on June 26, 2001, in Multnomah County. A notice of sale was published on July 23 and 30, 2001, and August 6 and 13, 2001, setting the sale date for November 8, 2001.

Rainey received notice of Bickell's default and Bankers Trust's election to sell on August 17. On September 10, 2001, Cal-Western recognized that, due to a late service of the notice, it would need to postpone the scheduled sale until December 17, 2001. Because the sale had been noticed for November 8, 2001, Cal-Western determined that it would be necessary to publicly announce the postponement at the sale on November 8. Bickell, who had been ill since late 1999, died on September 25, 2001, and Rainey was named the executor of her estate. On November 8, Cal-Western, through the auctioneer it authorized as its agent, announced the postponement of the sale until December 17, 2001. Also on November 8, defendant entered into a loan forbearance agreement with Rainey. However, on December 1, 2001, Rainey failed to make a scheduled payment under that forbearance agreement. On December 14, defendant sent an e-mail to Cal-Western, instructing it to proceed with the sale scheduled for December 17. On December 15, Rainey and defendant entered into a new forbearance agreement and, in accordance with that agreement, defendant told Rainey that the December 17 sale would be postponed. However, defendant did not notify Cal-Western of the new forbearance agreement or that it had agreed to postpone the sale.

On December 17, Rainey mailed a payment under the new forbearance agreement to defendant. He then went to the scheduled sale and informed the bidders and Cal-Western's auctioneer that he had entered into a new forbearance agreement and that the sale should therefore not proceed. The auctioneer made several attempts to contact defendant by telephone. While the auctioneer attempted to

reach defendant, Rainey showed the bidders the receipt for the cashier's check that he had mailed to defendant as his first payment under the new forbearance agreement. The auctioneer's attempts to reach defendant were unsuccessful, according to Rainey. However, plaintiff's president stated in an affidavit that the auctioneer "received a return [phone] call from his office, announced that he had authority to conduct the sale and thereafter conducted the sale." In his own affidavit, Rainey stated that, after the auctioneer's telephone calls, the auctioneer, "despite [Rainey's] objections, eventually conducted the sale." Plaintiff was the high bidder at the auction and tendered a cashier's check to the auctioneer for the purchase price. Rainey contacted defendant about the auction later that day. After defendant learned that Cal-Western had auctioned the property, defendant contacted Cal-Western and instructed it not to issue the trustee's deed to plaintiff. On December 18, Cal-Western returned plaintiff's purchase funds.

Plaintiff subsequently filed this action for breach of contract and breach of warranty of authority, seeking to recover lost profits that it would have realized after reselling the property.[2] Defendant answered that the sale of the property was void because Rainey was not properly notified of the December 17 foreclosure sale, because the forbearance agreement between defendant and Rainey deprived Cal-Western of the power of sale, because the auctioneer mistakenly believed that he had authority to sell the property, and because defendant had redeemed the sale on Rainey's behalf by returning plaintiff's funds. Both parties moved for summary judgment. The trial court granted plaintiff's motion for partial summary judgment (reserving the issue of damages) and denied defendant's motion in its entirety. Thereafter, the court entered a judgment against defendant for plaintiff's damages, which were stipulated to be the difference in the fair market value of the subject property and plaintiff's high bid at the foreclosure sale, and dismissed plaintiff's case against Cal-Western.

Defendant appeals from that judgment and from the court's denial of its motion for summary judgment and entry

---

[2] Plaintiff does not seek specific performance of the sale agreement.

of summary judgment for plaintiff on its breach of contract claim. Plaintiff cross-appeals, arguing that, if we conclude that defendant was entitled to summary judgment on plaintiff's breach of contract claim, then we should reverse the trial court's dismissal of plaintiff's claim for breach of warranty of authority against Cal-Western.

On appeal, defendant reiterates its position before the trial court and asserts four assignments of error. Because we conclude that Cal-Western lacked the statutory power of sale due to the forbearance agreement between defendant and Rainey, we resolve the appeal on that ground and do not consider the others.

Defendant argues that the forbearance agreement deprived Cal-Western of the power of sale under ORS 86.735 absent any default under the forbearance agreement. In those circumstances, according to defendant, contract formation is precluded as a matter of law, and the sale is therefore void. Plaintiff responds that, because the forbearance agreement provided that the default under the trust deed continued until performance under the forbearance agreement was completed, all of the statutory prerequisites to a foreclosure sale "remained in existence" and the trustee was obligated to execute and deliver a trustee's deed conveying the property to plaintiff.

The question is one of first impression in Oregon. ORS 86.735 provides:

> "The trustee may foreclose a trust deed by advertisement and sale in the manner provided in ORS 86.740 to 86.755 if:
>
> "* * * * *
>
> "(2)   There is a default by the grantor or other person owing an obligation, the performance of which is secured by the trust deed, or by their successors in interest with respect to any provision in the deed which authorizes sale in the event of default of such provision[.]"

Thus, in Oregon, as a precondition to the trustee's exercise of the power of sale, there must be a present default by the grantor for which sale is authorized by the terms of the deed. We therefore examine the effect of the parties' forbearance

agreement on Bickell's default. That agreement, "[i]n consideration of the Lender's forbearance of its right to pursue remedies for default," established a revised payment plan for payments due under the trust deed. Specifically, it established monthly payments of $1,840.56, beginning December 25, 2001, and continuing through May 25, 2002, and one additional payment of $1,106.55, due June 25, 2002, after which time, according to the terms of the agreement, "[b]orrowers shall resume normal monthly payments." The agreement also included the following relevant provisions:

"We agree that the default continues to exist until this Agreement is fully and completely performed.

"If the above-referenced payments are not **RECEIVED** on or before each Due Date, the Lender will continue with any remedies, as outlined in the terms of my loan documents, including but not limited to foreclosure, without further notice or demand.

"During the terms of this Agreement, we shall not have the benefit of a grace period.

"We acknowledge receipt of all notice required by law. Acceleration and/or foreclosure may continue under the notices of default, acceleration, and/or sale that were previously delivered and/or recorded.

"Lender has not waived its right to proceed with existing acceleration and/or foreclosure by acceptance of partial payments unless and until we make all payments due under this Agreement by the Due Dates referenced above.

"\* \* \* \* \*

"As long as this Agreement remains active and until we have fully performed our payment obligations under this Agreement, any scheduled foreclosure sale shall be considered postponed by mutual agreement by the signing parties.

"Nothing in this Agreement modifies or nullifies the terms of the Note and Deed of Trust/Mortgage, which shall remain in full force and effect."

(Boldface and capitalization in original.)

██    In ascertaining the terms of a contract, we examine the parties' objective manifestations of intent, as evidenced

by their communications and acts. *Kabil Developments Corp. v. Mignot*, 279 Or 151, 157-58, 566 P2d 505 (1977). We follow the analysis described in *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997), the first step of which is to examine the text of disputed provisions in the context of the document as a whole. If the text's meaning is unambiguous, we decide the provisions' meaning as a matter of law. *Id.* The provisions are ambiguous if they have no definite meaning or are capable of more than one sensible and reasonable interpretation in the context of the agreement as a whole. *Id.* at 362-63; *Quality Contractors, Inc. v. Jacobsen*, 139 Or App 366, 370-71, 911 P2d 1268, *rev den*, 323 Or 691 (1996). In determining whether a contractual term is ambiguous, a court may consider evidence of the circumstances underlying the formation of the contract. ORS 42.220; *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 315-17, 129 P3 d 773, *rev den*, 341 Or 366 (2006).

■    Applying those principles, we conclude that the forbearance agreement modified the payment terms under the trust deed and note such that, as long as Rainey made each payment by the specified due date, there was no default for which power of sale was authorized under ORS 86.735. In other words, the forbearance agreement suspended Cal-Western's statutory power of sale during the term of the agreement to the extent that Rainey continued to meet his obligations under the agreement.

The parties agreed to a revised payment plan with specified amounts and due dates. They also agreed that, at the conclusion of the agreement, normal monthly payments would "resume." In addition, the agreement explicitly states that "any scheduled foreclosure sale shall be considered postponed" as long as the agreement remained active. Finally, the agreement provides that "[i]f the above-referenced payments are not **RECEIVED** on or before each Due Date, the Lender will continue with any remedies * * * including but not limited to foreclosure, without further notice or demand." (Boldface and capitalization in original.) Those provisions indicate that the agreement was intended to give Rainey an opportunity to bring the loan current, during which time defendant would refrain from foreclosing on the property. If,

however, Rainey failed to make the payments as required under the revised plan, defendant preserved its right to continue with the foreclosure proceedings it had previously initiated, without further notice.

Other provisions of the agreement initially appear inconsistent with this conclusion. As plaintiff points out, the agreement expressly states that the loan is in default and that the default "continues to exist" until the agreement is fully and completely performed. The agreement, by its terms, would not be completely performed until June 25, 2002, the date the final payment was due under the forbearance agreement. The agreement also specifies that "Lender has not waived its right to proceed with the existing * * * foreclosure by acceptance of partial payments unless and until [Borrower] make[s] all payments due under this Agreement."

Considering the agreement as a whole, however, and giving meaning to each of its provisions, *Yogman*, 325 Or at 361; *see also* ORS 42.230 ("where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all"), the only reasonable interpretation of the forbearance agreement is that, while it preserved the underlying predicate facts that established the default under the trust deed—facts that would entitle defendant to foreclose the property in the event that the borrower did not meet his obligations under the forbearance agreement—it also modified the payments due under the trust deed during the life of the agreement such that, at the time of the foreclosure sale, there were no sums past due and, therefore, no default for which the power of sale was authorized under ORS 86.735. Put another way, although the parties agreed that a default exists, they also agreed that that default did not entitle defendant to foreclose the trust deed as long as Rainey complied with the terms of the forbearance agreement.

We note that the Idaho Supreme Court recently considered similar facts under Idaho Code section 45-1505(2) (1997), a provision of that state's nonjudicial foreclosure statutes. *Taylor v. Just*, 138 Idaho 137, 59 P3d 308 (2002). Although the Idaho court's construction of Idaho law does not control our construction of Oregon law, it is helpful because

ORS 86.735 is similar to Idaho Code section 45-1505(2) (1997).[3] *See State v. Stalheim*, 23 Or App 371, 376, 542 P2d 913 (1975), *aff'd*, 275 Or 683, 552 P2d 829 (1976) (federal and New York interpretations of statutory term not binding on Oregon, but they are persuasive because the statutes are similar). In *Taylor*, the beneficiary and the grantor had agreed, two days before a scheduled foreclosure sale, that the beneficiary would forbear from foreclosing the trust deed. The trustee learned of the forbearance agreement after it had conducted the foreclosure sale but before it issued the deed to the high bidder. The trustee returned the bidder's check, and the bidder brought an action seeking a declaratory judgment that he was the owner of the property and, alternatively, damages from the trustee and beneficiaries for breach of the contract of sale. 138 Idaho at 139, 59 P3d at 310.

The forbearance agreement at issue in *Taylor* modified the payments due under the promissory note and provided that, during the term of the agreement,

"so long as Borrower(s) does not default in any performance required by this Agreement and does not default in any performance required by the Note (except as modified by this Agreement) and Mortgage lender agrees to forbear from scheduling a sheriffs sale, and to forbear from proceeding with the filing of a Foreclosure."

138 Idaho at 140, 59 P3d at 311. It further provided,

"Should Borrower(s) fail to make any payment required by this Agreement or perform any other act required by this Agreement or should any representation or warranty given by Borrower(s) be untrue or shall be breached, Lender shall have the right to pursue all remedies available to it under the Note, Mortgage and/or Final Judgment. In executing this agreement, Borrower(s) specifically acknowledges that the Notice of Default shall not be rescinded and shall be an instrument or record until withdrawn by Lender."

---

[3] Idaho Code section 45-1505(2) (1997) provided that

"[t]he trustee may foreclose a trust deed by advertisement and sale under this act if * * * [t]here is a default by the grantor * * * owing an obligation the performance of which is secured by the trust deed or by their successors in interest with respect to any provision in the deed which authorizes sale in the event of default of such provision[.]"

*Id.* The court construed the agreement to mean

> "(1) that the terms of the promissory note were modified so that there were no longer any sums that were past due; (2) that [Lender] could not proceed with foreclosing the deed of trust unless there was a new default in the Agreement or in the promissory note; and (3) that if there was a future default then [Lender] could pursue all remedies available to it."

*Id.* at 141, 59 P3d at 312. Thus, the court concluded, "the Agreement by its terms cured the default because under the Agreement, there were no longer any sums past due. Under its terms, it would require a new default by the [Borrower] for [Lender] to be able to foreclose the deed of trust." *Id.* Based on that analysis, the court held that the contract of sale was void under Idaho Code Section 45-1505(2).

Although the parties in *Taylor* explicitly recognized that the repayment agreement modified the underlying promissory note, the effect is the same here. Once the forbearance agreement was executed, there were no sums past due unless and until Rainey failed to make the payments specified in that agreement. Only this construction gives effect to the entire agreement between the parties. To conclude otherwise would require us to ignore several key provisions of the agreement, particularly those establishing the revised payment plan and postponing the foreclosure sale.

This interpretation of the agreement is also consistent with evidence in the summary judgment record of the circumstances surrounding the formation of the contract. *Batzer Construction, Inc.*, 204 Or App at 315-17. In support of defendant's motion for summary judgment, Matthews, employed as a default specialist for defendant, stated in his affidavit that he spoke by telephone with Rainey on December 15, 2001, about entering into a new repayment plan "to cure the default under the loan and to postpone the foreclosure sale." Defendant subsequently approved this repayment plan and agreed to postpone the sale.

Under the terms of the forbearance agreement, the first payment was due on or before December 25, 2001. Consequently, at the time of the foreclosure sale on December 17, 2001, no payments were yet due under the forbearance

agreement.[4] Thus, for the purposes of ORS 86.735, there was no default for which sale of the property was authorized at that time. Because the preconditions to Cal-Western's exercise of the power of sale under ORS 86.735(2) were not satisfied, we conclude that Cal-Western lacked the statutory authority to sell the property.

■ ■    We next must consider the effect of that lack of authority on the purported agreement of sale. The leading case considering the validity of an agreement in which one of the parties has violated a statute is *Uhlmann v. Kin Daw*, 97 Or 681, 193 P 435 (1920). As the Supreme Court explained in that case, the general rule is that an agreement may not be enforced if it is illegal: "[S]tating the rule broadly, an agreement is illegal if it violates a statute or cannot be performed without violating a statute." *Id.* at 689. However, the court also stated that

> "[t]he rule that an agreement is illegal and unenforceable if it conflicts with the provisions of a statute is not inexorable and unbending. * * * The inquiry is as to the legislative intent, and that may be ascertained, not only by an examination of the express terms of the statute, but it may also be implied from the several provisions of the enactment. Of course, if a statute expressly declares that an agreement made in contravention of it is void, then the inquiry is at an end; but, in the absence of such a declaration, the court may take the statute by its four corners and carefully consider the terms of the statute, its object, the evil it was enacted to remedy, and the effect of holding agreements in violation of it void, for the purpose of ascertaining whether it was the legislative intent to make such agreements void[.]"

*Id.* at 689-90. Thus, in the absence of an express statutory provision voiding the agreement of sale, as in this case, the question of the contract's enforceability is one of legislative intent. To determine whether the legislature intended agreements such as this one to be void, we apply the methodology set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993), and look first to the text and context of the applicable statute. *Mayfly Group, Inc. v.*

---

[4] In any event, the record discloses that defendant received Rainey's initial payment on or about December 21, 2001.

*Ruiz*, 208 Or App 219, 222, 144 P3d 1025 (2006). As we noted in *Wheeler v. Bucksteel Co.*, 73 Or App 495, 498, 698 P2d 995, *rev den*, 299 Or 583 (1985), *Uhlmann* and subsequent cases

> "require an examination of the entire statutory scheme, rather than emphasizing the presence or absence of a particular provision, to determine whether the statutory prohibition goes to the substance of the challenged agreement or is collateral to it and the relation of the protective purpose of the legislation to the subject matter of the contract."

In *Wheeler*, we held that a contract for engineering services was unenforceable because it was made in violation of statutes prohibiting a person from practicing engineering in the absence of registration and a valid certificate to practice. 73 Or App at 500. Although the statutes did not expressly invalidate such noncomplying agreements, we concluded that, because the act was designed to protect the public from incompetent engineers, and the acts which the statute prohibited went "to the very heart" of the agreement in question, invalidation was required. *Id.*

In this case, defendant contends that the sale is void because the public policy embodied in the Oregon Trust Deed Act (Act), ORS 86.705 to 86.795, and implicit specifically in ORS 86.735, is to "prevent the wrongful loss of property by a borrower while also maintaining the efficient remedy of sale through the nonjudicial foreclosure process." According to defendant, permitting the sale of borrower's property after an agreement has been reached to postpone the sale would violate that policy.

Pointing to ORS 86.755(3),[5] plaintiff counters that the public policy of the State of Oregon as expressed by the legislature "dictates that foreclosure sales should be binding upon the close of the auction" to support obtaining the highest possible price. Allowing lenders and trustees to "shirk their responsibilities to convey title to properties purchased at a foreclosure sale" violates this policy and may have the effect of depressing the prices bid at foreclosure sales.

---

[5] ORS 86.755(3) provides, "The purchaser shall pay at the time of sale the price bid, and, within 10 days following payment, the trustee shall execute and deliver the trustee's deed to the purchaser."

■ On balance, we agree with defendant. The Act represents a well-coordinated statutory scheme to protect grantors from the unauthorized foreclosure and wrongful sale of property, while at the same time providing creditors with a quick and efficient remedy against a defaulting grantor. As discussed above, it confers upon a trustee the power to sell property securing an obligation under a trust deed in the event of default, without the necessity for judicial action. However, the trustee's power of sale is subject to strict statutory rules designed to protect the grantor, including provisions relating to notice and reinstatement.

For example, the trustee or beneficiary must record a notice of default in the county clerk's office and notify the grantor of a foreclosure sale at least 120 days prior to the sale. *See* ORS 86.735(3); ORS 86.740; ORS 86.745. In addition, the Act provides a mechanism by which the grantor can, at any time prior to five days before the date set for sale, cure the default and dismiss the proceedings. In that case, the trust deed is reinstated and has the same force as if no acceleration had occurred. ORS 86.753.

Those provisions reflect the legislature's intent to protect the grantor against the unauthorized loss of its property and to give the grantor sufficient opportunity to cure the default. The ability of the grantor to postpone the sale by entering into, and complying with, a forbearance agreement with the beneficiary furthers that legislative intent. Enforcing a sale of the property at auction despite the existence of such an agreement would undermine that purpose of the Act.

We are not persuaded that voiding agreements made in violation of ORS 86.735(2), under the circumstances present here, would frustrate the legislature's objective to provide a quick and efficient remedy for creditors against defaulting buyers. First, there is nothing in the language of that section or, indeed, elsewhere in the Act, to indicate that the legislature intended the auction to be final *in the absence of legal authority to sell the property*. Moreover, although certainty is an important component of the nonjudicial foreclosure sale remedy, we do not agree with plaintiff's statement, based on ORS 86.755(3), that "[t]he Oregon statutory scheme * * * provide[s] that the auction is final with the close of that

auction[.]"[6] Plaintiff correctly notes that ORS 86.755(3) provides that the trustee shall execute and deliver the trustee's deed within 10 days following payment of the price bid; however, under ORS 86.780, the statutory presumption of finality does not arise until the trustee's deed is issued and recorded.[7] We have not had occasion to squarely confront the question of the significance of the execution and recording of the trustee's deed on the finality of a nonjudicial foreclosure sale,[8] and it is not necessary for us to do so here, except to note that, if the agreement to postpone the sale is discovered before the trustee's deed is executed, voiding the contract furthers the purpose of the Act to protect the grantor from unauthorized sales without unduly prejudicing the creditor's remedy envisioned by the Act.

The legislature, in enacting ORS 86.735(2), prohibited a trustee from foreclosing on a property unless a default existed. As in *Wheeler*, this prohibition goes to the substance of the challenged agreement. We see no basis for holding that a foreclosure sale entered into in violation of this statutory prohibition should be enforced. We conclude that, as a matter of law, although plaintiff was the high bidder at the foreclosure sale, the discovery of the agreement to postpone the sale before the execution of the trustee's deed renders the contract

---

[6] Plaintiff contends that our decision in *Bank of Myrtle Point v. Security Bank of Coos Co.*, 79 Or App 184, 718 P2d 1373 (1986), supports that position. We disagree. Contrary to the case at bar, the issue in *Bank of Myrtle Point* was whether a *mistake* on the part of the *bidder* in bidding more than it intended justified the trustee setting aside the sale after the trustee's deed had been delivered and recorded. We held that it did not.

[7] ORS 86.780 provides:

"When the trustee's deed is recorded in the deed records of the county or counties where the property described in the deed is situated, the recitals contained in the deed and in the affidavits required under ORS 86.750(3) shall be prima facie evidence in any court of the truth of the matters set forth therein, but the recitals shall be conclusive in favor of a purchaser for value in good faith relying upon them."

[8] However, we have held, in the context of a forcible detainer action, that the high bidder at a trustee's sale was a not a "purchaser" under ORS 86.755(5) (providing that the purchaser at a trustee's sale is entitled to possession of the property on the tenth day following sale) and thus was not entitled to possession of the property, because service of the notice of the trust deed foreclosure and sale was defective. *Option One Mortgage Corporation v. Wall*, 159 Or App 354, 361, 977 P2d 408 (1999).

void and plaintiff's remedy is limited to return of the purchase funds and, if applicable, interest. This result properly restores the parties to the positions they would have occupied had the wrongful sale not occurred.

In light of that conclusion, plaintiff's argument that even if Cal-Western did not have statutory authority to sell the property, defendant is still liable under the contract of sale under the agency theory of apparent authority also must fail. As we have indicated, the attempted sale is void. That Cal-Western may have had apparent authority to sell the property under common law agency principles could not change that result. *Cf. Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 683, 669 P2d 1132 (1983) (municipality may be bound by the promise of its agent acting beyond the scope of its actual authority if, among other requirements, the promise is one which the municipality could lawfully make and perform).

For the reasons above, we conclude that defendant was entitled to prevail as a matter of law and that the trial court erred in granting plaintiff's motion for summary judgment and in denying defendant's motion for summary judgment on plaintiff's breach of contract claim.

As noted, on cross-appeal, plaintiff assigns error to the trial court's dismissal of its claim for breach of warranty of authority against Cal-Western. It appears that the court dismissed the claim because its decision in plaintiff's favor on its claim against defendant rendered the claim against Cal-Western moot. Our reversal of the judgment in favor of plaintiff on defendant's breach of contract claim means that the claim against Cal-Western now is not moot. Although our decision in plaintiff's claim against defendant may foreclose any recovery by plaintiff on its breach of warranty of authority claim against Cal-Western, *see Schafer et al v. Fraser et ux*, 206 Or 446, 466, 290 P2d 190 (1955), *on reh'g*, 294 P2d 609 (1956); *see also Hermann v. Clark*, 108 Or 457, 476, 219 P 608 (1923), the parties have not had an opportunity to address the issue. Accordingly, we vacate the trial court's judgment of dismissal of plaintiff's claim for breach of warranty of authority against Cal-Western and remand for further proceedings.

Reversed and remanded with instructions to enter summary judgment for defendant Homecomings Financial Network; judgment of dismissal against defendant Cal-Western Reconveyance Corporation vacated and remanded.