Argued and submitted July 25, 2006, affirmed October 31, 2007

Gail Glick ANDREWS,
*Appellant,*

*v.*

SANDPIPER VILLAGERS, INC.,
an Oregon corporation,
its Board of Directors and
Architectural Review Committee,
*Respondent.*

04233; A129071

170 P3d 1098

James K. Brewer argued the cause for appellant. On the brief were Scott A. Fewel and Fewel & Brewer.

Clifford G. Collard argued the cause and filed the brief for respondent.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

ORTEGA, J.

---

* Landau, J., *vice* Richardson, S. J.

## ORTEGA, J.

Plaintiff brought this action against defendant—a homeowners association (the association), its board of directors (the board), and its architectural review committee (the ARC)—seeking to quiet title in real property and a declaration that the conditions, covenants, and restrictions (CCRs) that were applicable to plaintiff's property did not require her to trim or cut trees to protect the ocean view of a neighbor. The trial court granted summary judgment to defendant, along with attorney fees. Plaintiff appeals, contending that issues of both law and fact precluded summary judgment. We affirm.

Summary judgment is proper if the "pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact." ORCP 47 C. "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." *Id.*; *see also Bachmeier v. Tuttle*, 195 Or App 83, 85, 96 P3d 871 (2004) (in reviewing the allowance of summary judgment, we view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor).

Except where specifically noted, the following facts were not disputed. The association consists of owners of property in Sandpiper Village, a coastal subdivision in Lincoln County. When the subdivision was originally platted in 1968, the developer recorded a declaration of covenants and restrictions (the 1968 CCRs) requiring that there could be "[n]o trees, hedges, shrubbery, plantings or fencing of any kind whatsoever in excess of six feet in height." The 1968 CCRs also provided that the covenants and restrictions therein were to remain in effect for 25 years, after which they would automatically extend for 10-year periods "unless an instrument signed by a majority of the then owners of all lots within the said property has been recorded, agreeing to extinguish or change said covenants and restrictions in whole or in part." The covenants and restrictions also could be amended

prior to the expiration of the 25-year period by the affirmative vote of two-thirds of the lot owners, with each lot having one vote.

Twenty-five years later, in 1993, the board proposed an "amended declaration" (the 1993 CCRs). As pertinent here, it included the following provision:

"3.2.2. Trees, Shrubbery and Fencing. No trees, hedges, shrubbery, plantings or fencing of any kind shall be allowed to obstruct the ocean view without written approval of [the board]. View impairment will be determined by the [ARC], who will give the owner written notification to trim the vegetation blocking the view. After thirty (30) days, the [ARC] shall have the authority to hire an appropriate person or persons to complete the work at the owner's expense. This recourse will be taken if the owner fails to comply with the original request."

A majority of homeowners voted to adopt the amendments. The 1993 CCRs were then recorded, accompanied by a signed and notarized "certification" by LeBaron, the then-president of the association, and Rubin, its then-secretary, attesting that the CCRs were approved by 51 percent or more of the homeowners.

In 1994, the association's legal counsel, Dumas, and the chair of the ARC, Strassmaier, drafted several proposed substantive amendments to the 1993 CCRs, not including any amendment to Section 3.2.2, quoted above. Most of the proposed amendments were approved by vote of the homeowners. At the same time, Dumas drafted what he termed to be "stylistic" changes to the other provisions and reorganized and renumbered the CCRs; those changes were not voted on by the homeowners. Following Dumas's ostensibly stylistic changes and renumbering, Section 3.2.2 of the 1993 CCRs became Section 3.6 and provided as follows:

"3.6 Ocean View. No trees, hedges, shrubbery, plantings, or fencing shall obstruct the view of the ocean from designated ocean view lots without the written approval of [the board]. View obstruction shall be determined by the ARC."

In addition, Section 8.3 of the 1994 CCRs provided, in part, that, "[i]f a provision is subject to more than one reasonable interpretation, any reasonable interpretation adopted by [the

board] shall control." The 1994 CCRs—including both the approved amendments and Dumas's additional changes—were recorded, again accompanied by a certification by LeBaron and the then-secretary, Robbie Vitus, to the effect that they had been approved by 51 percent or more of the homeowners.

Plaintiff purchased property in Sandpiper Village in 1997, after all of those events. At that time, she reviewed the 1994 CCRs as part of her title report, including the certification that the CCRs had been approved by at least 51 percent of the homeowners.

In June 2003, another member of the association, Gildroy, sent a written notice to plaintiff and the ARC, requesting that plaintiff trim trees on her property in order to preserve Gildroy's view. Plaintiff did not trim the trees. Eight months later, the ARC requested in writing that plaintiff trim the trees within 45 days.

Instead, plaintiff initiated this action. In her first claim for relief in the operative complaint, plaintiff sought a declaration that the association had no authority to require her to trim the trees because there was no documentation or other evidence showing that Gildroy's property was a "designated [ocean] view lot." In her second claim for relief, she sought to quiet title in her property to the effect that the CCRs were void by reason of failing to comply with applicable state statutes. Plaintiff also sought reasonable attorney fees and costs.

Defendant answered and also moved for summary judgment. As pertinent here, in support of its motion defendant contended that plaintiff's legal challenge was based entirely on the inclusion in the 1994 CCRs of the phrase, "designated ocean view lots"; that, because that phrase was drafted as a stylistic change by Dumas and was never voted on by the homeowners, it should be disregarded; and that, without that phrase, the 1994 CCRs had the same effect as the 1993 CCRs. Alternatively, defendant argued that, even assuming that the phrase is a valid part of the 1994 CCRs, the phrase is ambiguous and the court either should defer, in the absence of any showing of fraud or bad faith, to the ARC's interpretation of it, or should determine, based on extrinsic

evidence—including Dumas's affidavit and the absence of any list of "designated" lots—that it was not intended to effect a substantive change to the 1993 CCRs, under which all lots were entitled to view protection. Defendant also contended that it was not bound by a representation that plaintiff had invoked by a former ARC chairperson regarding the meaning of the phrase "designated ocean view lots." It argued that plaintiff could not in any event reasonably rely on that representation because, in making it, the former chairperson acted only as an individual and did not represent the ARC or intend for plaintiff to rely on her statement and because Gildroy's lot patently did have an ocean view; moreover, there was no evidence that plaintiff did in fact rely on the statement.

In opposition to the motion, plaintiff asserted the existence of a material issue of fact relating to whether the 1994 CCRs were properly enacted. Plaintiff contended that Dumas's attestation as to the meaning and validity of the 1994 CCRs could not be taken to reflect the understanding of a party to the agreement and conflicted with an August 2000 letter in which he asserted that the 1994 CCRs were valid regardless of any insufficiency in their adoption. Plaintiff also argued that, to the extent that defendant was attempting to rely on the 1993 CCRs, there was no evidence that those CCRs were properly enacted. Plaintiff further contended that the meaning of the phrase "designated ocean view lots" in the 1994 CCRs was unambiguous and that there was no evidence that Gildroy's lot had been so designated; moreover, even if the CCRs were ambiguous, consistently with another provision of the CCRs, the board, not the ARC, was authorized to interpret them, and they should be construed against the drafter, namely, the board. Finally, plaintiff argued that, where title records caused property purchasers and owners to understand that the 1994 CCRs were valid, where defendant did nothing to correct that understanding, and where owners relied on them, defendant was equitably estopped from asserting that the 1994 CCRs were not validly enacted.

As noted, the trial court awarded summary judgment in favor of defendant and, in a supplemental judgment, awarded it attorney fees and costs.

In her first assignment of error, plaintiff contends that the trial court erred because the phrase "from designated ocean view lots" in the 1994 CCRs is unambiguous. According to plaintiff, where the term "designated" is in the past tense, such designation must occur before the ARC determines whether there is a view obstruction and takes action to remove the obstruction, a process that, on this record, did not take place in regard to Gildroy's lot. Plaintiff further argues that the fact that the CCRs themselves set out no process for making such a designation does not create an ambiguity; rather, it merely creates a question of fact as to whether a particular property was designated. Plaintiff also contends that the ARC had no authority to interpret the CCRs and that the record lacks any evidence that the board undertook to interpret them.

Plaintiff next argues that, even assuming that the relevant portion of the 1994 CCRs was ambiguous, we should disregard evidence of Dumas's intent and related extrinsic evidence that, according to plaintiff, is rendered unreliable in light of what plaintiff deems the patently erroneous certification of the 1994 CCRs by LeBaron and Vitus and in light of evidence of Dumas's later and assertedly inconsistent written statement regarding the validity and enforceability of the 1994 CCRs. Plaintiff contends that the only relevant extrinsic evidence in the record relates to the conduct of the parties, including evidence that a former chairperson of the ARC assured plaintiff that Gildroy's lot was not a designated ocean view lot and evidence of other instances in which the ARC purportedly has determined or informed plaintiff that other lots are or are not designated ocean view lots. Plaintiff also argues that, to the extent that the 1994 CCRs are ambiguous, this court should construe them against defendant. Finally, plaintiff contends that, to the extent that the 1994 CCRs are not given effect, there are questions of fact regarding the 1993 CCRs that also preclude summary judgment, including possible defects in the approval of those CCRs.

Defendant responds that the phrase "designated ocean view lots" can plausibly be given more than one meaning. Specifically, defendant asserts that the phrase may mean a particular subset of all ocean view lots within Sandpiper Village—those expressly determined by some

entity to be ocean view lots; alternatively, it may mean all lots that can be characterized as ocean view lots. Given that ambiguity, and relying on the method of interpretation of ambiguous provisions that is set out in *Yogman v. Parrott*, 325 Or 358, 363-64, 937 P2d 1019 (1997), defendant points to extrinsic evidence of the meaning of the phrase, as to which they contend there is no factual dispute. Specifically, defendant relies on Section 3.2.2 of the 1993 CCRs, which, it contends, protected all ocean view lots; and evidence—namely, Dumas's communications to the board—that changes to the relevant portions of the 1994 CCRs were not intended to change the substance of the 1993 CCRs. Defendant further argues that the ARC properly should be understood to be the designating entity and that its authority in that respect properly can be exercised at the time it orders an owner to trim trees on her lot; according to defendant, under *Yogman*, evidence that the ARC conducted itself consistently with that understanding of the CCRs in this case constitutes further evidence of the CCRs' meaning. Defendant urges us to resolve any ambiguity at the second level of interpretation and not to apply maxims of interpretation. Defendant finally contends that, notwithstanding Section 8.2 of the 1994 CCRs, and in the absence of a contrary interpretation by the board of directors, the ARC was authorized to interpret a provision that it is charged with applying, namely, Section 3.6; additionally, in the absence of any proof of fraud, bad faith, or failure to exercise honest judgment, the interpretation and decision of the ARC are entitled to deference.

As previously noted, on review of the trial court's grant of summary judgment to defendant, we view the record in the light most favorable to plaintiff, the party opposing summary judgment, to determine whether defendant was entitled to judgment as a matter of law. ORCP 47 C. Specifically, the issue here is whether there is any genuine issue of material fact regarding the meaning of the 1994 CCRs and, if not, whether defendant is entitled to a judgment in its favor.

Whether defendant is entitled to a judgment in its favor in turn depends on the meaning of the CCRs that was most likely intended by the parties. *See* ORS 42.240; *see also Yogman*, 325 Or at 364; *McKay's Market of Coos Bay v. Pickett*, 212 Or App 7, 12, 157 P3d 291 (2007). In determining

that meaning, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts. *Staffordshire Investments, Inc. v. Cal-Western*, 209 Or App 528, 535-36, 149 P3d 150 (2006) (citing *Kabil Developments Corp. v. Mignot*, 279 Or 151, 157-58, 566 P2d 505 (1977)). We first examine the text of disputed provisions in the context of the document as a whole. If the text's meaning is unambiguous, we decide the meaning of the provisions as a matter of law. *Yogman*, 325 Or at 361. The provisions are ambiguous if they have no definite meaning or are capable of more than one sensible and reasonable interpretation in the context of the agreement as a whole. *See id.* at 362-63. Dictionary definitions may be used in the first step of the analysis to determine whether a provision is ambiguous. *See id.* at 362. If the disputed provisions are ambiguous, we proceed to a second step that involves examining extrinsic evidence of the contracting parties' intent, including, if helpful, evidence regarding the parties' "practical construction" of an agreement. *Id.* at 363-64. If resort to such extrinsic evidence does not resolve the ambiguity, then we proceed to a third and final step, namely resort to "appropriate maxims of construction." *Id.* at 364.[1]

■ Neither the phrase "designated ocean view lots" nor the term "designated" is defined in the 1994 CCRs. The ordinary meaning of the transitive verb "designate" is "to make known directly as if by sign **: SIGNIFY, INDICATE**"; "**DENOMINATE, IDENTIFY, LABEL**"; "to declare to be"; and "to choose and set apart." *Webster's Third New Int'l*

---

[1] In *Yogman*, the plaintiffs and the defendants owned houses in a beach-front subdivision. The properties were subject to a restrictive covenant requiring the properties to be used only for residential, and not commercial, purposes. The plaintiffs sought a declaration that the defendants' activity of renting their property for short periods violated that covenant. The trial court granted the plaintiffs' motion for summary judgment, but this court reversed, and the Supreme Court affirmed our decision. 325 Or at 360.

In doing so, the court first examined the meaning of the terms "residential" and "commercial enterprise" in the context of the covenant as a whole and concluded that the terms were ambiguous. *Id.* at 362-63. The court next determined that, although there was some evidence that another house in the subdivision and houses subject to similar covenants were used as rental properties, that extrinsic evidence was not sufficient to resolve the ambiguity. *Id.* at 363-64. It therefore applied the maxim calling for strict construction of restrictive covenants and concluded that, because the defendants' use of their property as rental property was not plainly prohibited by the covenant, it was permissible. *Id.* at 364-66.

*Dictionary* 612 (unabridged ed 2002). Synonyms include the verbs "name," "nominate," "elect," and "appoint." *Id*. Those definitions and synonyms suggest that a "designated ocean view lot" is one that has been declared, identified, labeled, named, or chosen and set apart as such. Even assuming that all lots in a development, and not just some subset of the total, could be so designated, those meanings further suggest that some actor has affirmatively performed the designation. Moreover, the fact that the term "designated" is in the past tense suggests that, at the relevant time—that is, the time at which view obstruction is determined—the task of designation has already been performed.

However, nothing in the 1994 CCRs expressly delegates the performance of that task to any entity. That the drafters of the 1994 CCRs knew how to delegate specific tasks to specific entities is apparent from the fact that Section 3.6 of the 1994 CCRs expressly delegates to the ARC the task of determining whether the view of a designated ocean view lot has been obstructed. Accordingly, the context of the 1994 CCRs as a whole suggests that, by referring to "designated ocean view lots," the drafters were not referring to any formal, separate, or independent designation process carried out in advance, in a particular manner, by a particular designating entity or actor, but merely to the determination of the existence of an ocean view that necessarily accompanies—or, more accurately, precedes, albeit by only a minimal time period—the determination that a view obstruction must be removed.

Examination of the text and context of Section 3.6 of the 1994 CCRs therefore discloses more than one plausible meaning of the phrase "designated ocean view lots." Again, the phrase may indicate that some or all of the lots in the development formally have been labeled as such by some entity and, moreover, that the designation has occurred before the determination regarding a view obstruction. Alternatively, because the 1994 CCRs do not expressly identify a designation process, an entity to perform the designation, or a time at which the designation is to be accomplished, the phrase plausibly refers merely to the ARC's implicit determination of the existence of an ocean view at the time it determines that the view has been obstructed.

Because the phrase is ambiguous, we next consider extrinsic evidence of its meaning. *Yogman*, 325 Or at 363. We begin with defendant's evidence, which includes the affidavit and attached exhibits of the association's legal counsel, Dumas. In his affidavit, Dumas attested that he prepared the 1994 CCRs for recording and that, in addition to incorporating the "substantive changes" to the 1993 CCRs that were voted on and approved by the homeowners, he prepared and incorporated "stylistic changes" to other sections of the CCRs.[2]

Also in the record is a 1994 letter from Dumas to Robbie Vitus, who was then secretary of the association, and Jim Vitus, an association member, in which he stated that the 1994 CCRs contained

"a few stylistic changes in wording and location of certain provisions. These stylistic changes do not alter the rights of the homeowners or the association, and therefore require no vote. They merely make the [CCRs] clearer and easier to read. In the unlikely event that a stylistic change is interpreted to have materially altered any right or obligation, that right or obligation shall be observed or enforced as it existed prior to such change."

Two months later, Dumas again wrote to the Vituses with a more detailed explanation of the "stylistic changes." As pertinent here, he explained:

---

[2] Dumas also attested that "[t]he addition of the phrase 'designated ocean view lots' to Section 3.6 was related to the concept of 'original natural trees' that existed in the 1968 [CCRs]." He explained that the 1968 CCRs included a six-foot height limitation for trees and shrubs but that the limitation did not apply to the "original natural" trees and shrubs on the association lots. He stated that it therefore was "reasonable to infer" that the height limitation was intended to protect ocean views and that, under the 1968 CCRs, ocean views that were obstructed by "original natural" trees and shrubs were not protected. He stated that, accordingly, he understood the phrase "designated ocean view lots" in the 1994 CCRs to mean lots with views not obstructed by original natural trees and shrubs. Because those attestations by Dumas relate only to his understanding of the CCRs and not to any facts surrounding their adoption, and because Dumas was not a party to the CCRs, we do not consider those statements as extrinsic evidence of the meaning of the 1994 CCRs. By the same token, we disregard plaintiff's observation in this court that there is "no evidence that [her] trees were not original natural trees."

"Section 3.2.2 has been renumbered as Section 3.6 and retitled *Ocean View*, which is more appropriate. The wording has been changed to state exactly the same thing, only more clearly and succinctly."

 In light of Dumas's assertion that the "stylistic changes" to the 1994 CCRs were not intended to change the substance of the 1993 CCRs, the 1993 CCRs constitute additional extrinsic evidence of the meaning of the 1994 CCRs. Section 3.2.2 of the 1993 CCRs, as quoted above, provides, in part that "[n]o trees, hedges, shrubbery, plantings or fencing of any kind shall be allowed to obstruct *the ocean view* without written approval of [the board]." (Emphasis added.) We agree with defendant that the unqualified reference to "the ocean view" suggests that the 1993 CCRs were intended to protect all lots that, as a matter of observable fact, have a view of the ocean. That evidence supports defendant's interpretation of the 1994 CCRs.[3]

Before offering extrinsic evidence of her own, plaintiff asserts that defendant's evidence does not resolve any ambiguity in the 1994 CCRs. As noted, she contends that the certification of homeowner approval of the 1994 amendments was indisputably inaccurate and that an analysis in August 2002 by Dumas regarding the validity of the 1994 CCRs was incorrect. Even assuming plaintiff is right, however, neither of those issues creates a material factual dispute regarding the substantive meaning of Section 3.6 of the 1994 CCRs.

 That leaves plaintiff's own offer of extrinsic evidence regarding the meaning of the 1994 CCRs, which consists of two examples of defendant's prior conduct. First, plaintiff attested in her affidavit that a past chairperson of the ARC, Stoutsenberger, assured her that Gildroy's lot was not a designated ocean view lot. However, the affidavit does not state whether Stoutsenberger was the chairperson of the ARC at the time she made the statement or, alternatively, at the time that the 1994 CCRs were adopted. As a result,

---

[3] We do not consider defendant's purported extrinsic evidence pertaining to their conduct in this case. Although extrinsic evidence includes evidence of the circumstances and conduct of the parties during the life of the agreement, *see Yogman*, 325 Or at 364, it logically does not include the unilateral conduct of a party that is the subject of the parties' dispute.

Stoutsenberg's alleged statement is insufficient to create a factual dispute about the meaning of the 1994 CCRs that the parties intended.

 Second, plaintiff points to the allegation in her amended complaint that "[t]he ARC has made determinations in the past that other properties within the development were not designated view properties." However, although pleadings frame the issues to be tried in a civil action, the factual allegations in pleadings, unless admitted by the opposing party, have no evidentiary effect. *See* ORCP 47 D (providing, in part, that the party adverse to a motion for summary judgment may not rely on mere allegations or denials of that party's pleadings); *see also Jones v. Lindsey*, 193 Or App 674, 677, 91 P3d 781 (2004). Indeed, plaintiff's allegation, without evidence of the context of those determinations, is insufficient to raise a material issue of fact in any event.

We conclude that extrinsic evidence makes clear the meaning of the provision at issue. Specifically, Dumas's contemporaneous communications indicate that Section 3.6 of the 1994 CCRs was intended to have the same substantive effect as Section 3.2.2 of the 1993 CCRs, which, by its terms, did not restrict the protection of ocean views to any particular ocean view lots, such as those that someone has previously "designated" as having an ocean view. Rather, it protected "the ocean view," without qualification, from obstruction caused by "trees, hedges, shrubbery, plantings, or fencing of any kind." It follows that, properly construed, the phrase "designated ocean view lots" in Section 3.6 of the 1994 CCRs refers to those lots that, as a matter of observable fact, have a view of the ocean. Plaintiff presented no contrary extrinsic evidence from which a jury could have found otherwise.[4]

In summary, there is no genuine issue of material fact pertaining to the meaning of Section 3.6 of the 1994

---

[4] Because extrinsic evidence makes clear the intended meaning of Section 3.6 of the 1994 CCRs, we need not proceed to the third level of contract interpretation, in which we apply relevant maxims of construction. Specifically, we need not decide whether Section 8.3 of the 1994 CCRs—which provides, in part, that, "[i]f a provision is subject to more than one reasonable interpretation, any reasonable interpretation adopted by [the board] shall control"—would be relevant in this case.

CCRs and, under that provision, defendant is entitled to judgment as a matter of law. Accordingly, the trial court did not err in granting summary judgment to defendant. Moreover, because we affirm the trial court in that regard, we also necessarily reject plaintiff's second assignment of error, in which she challenges the award of attorney fees and costs to defendant.

Affirmed.