128          September 9, 2015          No. 17

IN THE OREGON TAX COURT
REGULAR DIVISION

HEALTH NET, INC.
and Subsidiaries,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5127)

Plaintiffs (taxpayer) appealed to the Magistrate Division as to corporation excise tax. The case was then specially designated by a joint petition to the Regular Division. Taxpayer contended that the action of the Oregon legislature in adopting ORS 314.606 violated the Full Text Provision, the Oregon Contract Clause, the Federal Contract Clause, and the Compact Clause of the Oregon Constitution and United States Constitution. Granting Defendant's cross-motion for summary judgment, the court ruled that the actions of the Oregon legislature in adopting ORS 314.606 were for the purpose of disabling the Compact Election, that the legislative action violated no procedural or substantive provision of the Oregon Constitution and that it violated no provision of federal statutory law. Nor did it violate the Compact Clause or Federal Contract Clause. Therefore, the provisions of ORS 314.606 were applicable to taxpayer such that its claim for a refund of tax was properly and validly denied by Defendant.

Oral argument on cross-motions for summary judgment was held July 22, 2014, in the courtroom of the Oregon Tax Court, Salem.

Amy L. Silverstein, Silverstein & Pomerantz LLP, San Francisco, filed the motion and argued the cause for Plaintiffs (taxpayer).

Douglas M. Adair, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant (the department).

Decision for Defendant rendered September 9, 2015.

**HENRY C. BREITHAUPT, Judge.**

### I.    INTRODUCTION

This corporation excise tax case for the 2005 through 2007 tax years is before the court on cross-motions

for summary judgment filed by Plaintiffs (taxpayer) and Defendant (the department).

## II.   FACTS

The relevant facts have been established through stipulation, including stipulated exhibits. For the years at issue, those facts are as follows.

(1)   Taxpayer, a Delaware corporation headquartered in Woodland Hills, California, is engaged in the delivery of managed health care services through health plans and government-sponsored managed care plans.

(2)   Taxpayer is a federal affiliated group.

(3)   Taxpayer began doing business in the State of Oregon no later than 1989 and has continued doing business in Oregon since then.

(4)   The department is, and at all times mentioned herein was, the duly created agency and instrumentality of the State of Oregon charged with the administration of the tax laws of Oregon. ORS 305.120.[1]

(5)   This court has jurisdiction over this action pursuant to ORS 305.270(10) and ORS 305.501(1).

(6)   This is an action for refund of corporation excise taxes paid by taxpayer in the amount of $458,369, plus interest, for the tax years ending December 31, 2005; December 31, 2006; and December 31, 2007. The amounts for the individual years at issue are: $90,632 for 2005; $103,614 for 2006; and $264,123 for 2007.

(7)   During the years at issue, taxpayer engaged in a multistate, unitary business. Accordingly, taxpayer was required to determine the portion of its consolidated income subject to tax in Oregon by apportioning unitary income pursuant to an apportionment formula in the Oregon Revised Statutes.

---

[1] Unless otherwise specified, the court's references to the Oregon Revised Statutes (ORS) are to 2003. There were no material changes in later editions for the years at issue.

(8)　In its original tax returns for the years at issue, taxpayer apportioned the Oregon component of its consolidated income by using the Oregon apportionment formula found at ORS 314.650, which includes a single sales factor for apportionment.[2] Taxpayer's 2005 return was timely filed October 19, 2006. Its 2006 return was timely filed October 18, 2007. Its 2007 return was timely filed October 20, 2008.

(9)　The Internal Revenue Service (IRS) audited taxpayer's original federal tax returns for the years at issue. The IRS completed its audit and issued a Revenue Agent's Report with respect to the 2005 return on or about August 9, 2007, and an undated Revenue Agent's Report with respect to the 2007 return on or about July 2, 2009. No changes were made to the 2006 return.

(10)　The department audited taxpayer's original Oregon tax returns for the years at issue. The department completed its audit in January 2010. At the completion of the audit, taxpayer was assessed additional tax for 2005 in the amount of $43,209, and for 2006 in the amount of $35,439; the department decreased tax for 2007 in the amount of $56,966. On or about February 1, 2010, taxpayer paid $55,875 ($43,209 tax plus $12,666 interest) for 2005 and $43,284 ($35,439 tax plus $7,804 interest) for 2006, such payments resulting from refund offsets from other tax years.

(11)　On or about October 15, 2010, taxpayer filed timely amended returns/claims for refund for the years at issue ending December 31, 2005, and December 31, 2006, and subsequently filed a timely amended return/claim for refund for the year at issue ending December 31, 2007, on or about July 7, 2011. The amended returns/claims for refund changed the apportionment formula to the equally weighted three-factor formula (property, payroll, and sales) set forth at ORS 305.655, the Oregon enactment of the Multistate Tax Compact (the Compact), in accordance with Article III, section 1, of the Compact (the Compact Election).

---

[2] The term "sales" is defined in the statute as "all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.610(7).

(12)    In Notices of Proposed Refund Adjustment dated May 11, 2011, the department denied taxpayer's refund claims for the years at issue ending December 31, 2005, and December 31, 2006, on the basis that the Compact Election was not available to taxpayer.

(13)    In a Notice of Proposed Refund Adjustment dated August 23, 2011, the department partially denied taxpayer's refund claim for the year at issue ending December 31, 2007, on the basis that the Compact Election was not available to taxpayer.

(14)    Taxpayer timely appealed the Notices of Proposed Refund Adjustment and requested an in-person conference with the department regarding the Notices of Proposed Refund Adjustment for the years at issue.

(15)    By Conference Decision Letter, dated April 2, 2012, the department upheld the refund denials on the basis that the Compact Election was not available to taxpayer.

(16)    Taxpayer timely appealed the department's denial of its refund claims under ORS 305.270(10), ORS 305.280, and ORS 305.418 to the Magistrate Division of the Oregon Tax Court.

(17)    By Order filed on October 16, 2012, those refund claims were specially designated for hearing in the Regular Division of the Oregon Tax Court.

(18)    For the years at issue, Oregon did not change its Compact membership status to anything less than full membership.

(19)    Taxpayer's Oregon taxable income subject to apportionment for the years at issue was $212,656,103 for 2005, $178,742,961 for 2006, and $495,156,474 for 2007.

(20)    Taxpayer's Oregon payroll for the years at issue was $15,655,388 for 2005, $18,298,032 for 2006, and $17,449,624 for 2007, and taxpayer's everywhere payroll for the years at issue was $642,479,812 for 2005, $761,803,334 for 2006, and $774,312,433 for 2007.

(21)    Taxpayer's Oregon payroll percentage (*i.e.*, Oregon payroll divided by everywhere payroll) for the years

at issue was 2.4367 percent for 2005, 2.4019 percent for 2006, and 2.2536 percent for 2007.

(22)    Taxpayer's Oregon property for the years at issue was $8,614,258 for 2005, $9,653,981 for 2006, and $10,665,344 for 2007, and taxpayer's everywhere property for the years at issue was $698,277,293 for 2005, $728,873,891 for 2006, and $797,253,428 for 2007.

(23)    Taxpayer's Oregon property percentage (*i.e.*, Oregon property divided by everywhere property) for the years at issue was 1.2336 percent for 2005, 1.3245 percent for 2006, and 1.3378 percent for 2007.

(24)    Taxpayer's Oregon sales for the years at issue were $372,139,784 for 2005, $391,487,495 for 2006, and $400,658,306 for 2007, and taxpayer's everywhere sales for the years at issue were $11,561,469,701 for 2005, $12,308,639,159 for 2006, and $13,319,774,216 for 2007.

(25)    Taxpayer's Oregon sales percentage (*i.e.*, Oregon sales divided by everywhere sales) for the years at issue was 3.2188 percent for 2005, 3.1806 percent for 2006, and 3.0080 percent for 2007.

(26)    Under ORS 314.650 through 314.665, taxpayer's Oregon apportionment percentage for the years at issue was 2.9421 percent for 2005, 3.1806 percent for 2006, and 3.0080 percent for 2007.

(27)    If the Compact Election were allowed, taxpayer's Oregon apportionment percentage for the years at issue would be 2.29636 percent for 2005, 2.3023 percent for 2006, and 2.1998 percent for 2007.

(28)    Based on paragraphs 19 and 26 above, taxpayer's Oregon tax due for the years at issue was $264,525 for 2005, $375,217 for 2006, and $308,008 for 2007.

(29)    Based on paragraphs 19 and 27 above, if the Compact Election were allowed, taxpayer's Oregon tax due for the years at issue would be $173,893 for 2005, $271,603 for 2006, and $43,885 for 2007.

(30)    Except to the extent that ORS 305.765 requires otherwise, if taxpayer were permitted to use the

apportionment formula set forth in ORS 305.655, it would be entitled to a refund of tax for the years at issue of $90,632 for 2005, $103,614 for 2006, and $264,123 for 2007, plus interest as provided by law. If taxpayer were not permitted to use the apportionment formula set forth in ORS 305.655, taxpayer would not be entitled to a refund for the years at issue.

## III.   ISSUES

There are six issues for decision in this case:

(1)   What is the effect of Oregon Laws 1993, chapter 726, section 20 (codified and hereafter referred to as ORS 314.606)?

(2)   Did the legislative process employed in adopting ORS 314.606 violate Article IV, section 22, of the Oregon Constitution (the Full Text Provision)?

(3)   Did the action of the Oregon legislature in adopting ORS 314.606 violate Article I, section 21, of the Oregon Constitution (the Oregon Contract Clause)?

(4)   Did the action of the Oregon legislature in adopting ORS 314.606 violate a federal statute?

(5)   Did the action of the Oregon legislature in adopting ORS 314.606 violate Article I, section 10, clause 1, of the United States Constitution (the Federal Contract Clause)?

(6)   Did the action of the Oregon legislature in adopting ORS 314.606 violate Article I, section 10, clause 3, of the United States Constitution (the Compact Clause)?

## IV.   ANALYSIS

Taxpayer contends that the action of the Oregon legislature in adopting ORS 314.606 violated the Full Text Provision, the Oregon Contract Clause, the Federal Contract Clause, and the Compact Clause. Taxpayer—correctly—does not inquire as to the authority of the Oregon legislature to adopt ORS 314.606. That authority is plenary, subject to certain specific limitations.[3]

---

[3] *See* Hans A. Linde, *Without Due Process: Unconstitutional Law in Oregon*, 49 Or L Rev 125, 146 (1970).

Under the "first things first" doctrine, Oregon courts first examine state statutory issues and state constitutional claims before addressing any federal statutory or federal constitutional claims. *Hughes v. State of Oregon*, 314 Or 1, 12, 838 P2d 1018 (1992) (citing *Stelts v. State of Oregon*, 299 Or 252, 257, 701 P2d 1047 (1985); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983)).[4] As between state statutes and state constitutional matters, Oregon courts ordinarily analyze state statutory challenges before state constitutional ones. *Stelts*, 299 Or at 257. The court therefore first addresses the effect of ORS 314.606 and whether the actions of the Oregon legislature in enacting ORS 314.606 violated either procedural or substantive provisions of the Oregon Constitution.

A.    *Oregon's Effective Disablement of the Compact Election*

It is first necessary to determine whether, in adopting ORS 314.606, the Oregon legislature effectively disabled the Compact Election.[5] If it did not do so, the taxpayer would prevail in this matter without further consideration of other arguments as to the statute.

Prior to 1989, the apportionment formulas in ORS 305.655 and ORS 314.650 were the same: both used the three-factor formula. ORS 305.655, Art IV, § 9 (1987) (apportionment formula under Compact); ORS 314.650 (1987) (apportionment formula under Oregon UDITPA).[6] In 1989, the Oregon legislature amended the formula under Oregon UDITPA to provide for double-weighting of the sales factor, but did not do the same under the Compact formula. Or Laws 1989, ch 1088, § 1 (amending ORS 314.650) (effective for tax years beginning on or after January 1, 1991). The legislature subsequently amended the statute several

---

[4] *Id.* at 182; Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U Balt L Rev 379 (1980).

[5] Article III, section 1, of the Compact provides: "Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state *** may elect to apportion and allocate his income in the manner provided by the laws of such state *** without reference to this compact, or may elect to apportion and allocate in accordance with Article IV." ORS 305.655, Art III, § 1.

[6] "Oregon UDITPA" as used here refers to ORS 314.605 to 314.675. "UDITPA" used alone refers to the uniform law from which Oregon UDITPA was derived.

more times, providing for 80 percent sales factor weighting in 2001, and finally moving to a single sales factor in 2005. Or Laws 2001, ch 793, § 1; Or Laws 2005, ch 832, §§ 48-49.

In 1993, the Oregon legislature enacted ORS 314.606, which provides: "In any case in which the provisions of ORS 314.605 to 314.675 are inconsistent with the provisions of ORS 305.655, the provisions of ORS 314.605 to 314.675 shall control." Or Laws 1993, ch 726, § 20.[7]

The parties agree that prior to the enactment of ORS 314.606, taxpayer could elect either the single-factor sales formula under Oregon UDITPA or the three-factor formula under the Compact. Taxpayer argues that it continued to have the Compact Election for the years at issue. The department asserts that ORS 314.606 effectively disabled the Compact Election. In taxpayer's view, ORS 314.606 did not effectively disable the Compact Election because a choice between the compact apportionment formula and an alternative state formula is not inconsistent with—indeed, it is contemplated by—Article III of the Compact. The department argues that taxpayer's contention would render ORS 314.606 meaningless.

To resolve this issue, the court starts with the text, context, and legislative history of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). ORS 314.606 provides that Oregon UDITPA, including amendments, controls where its provisions are "inconsistent" with the Compact's provisions. *See Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 72, 346 P3d 476 (2015) ("[Oregon] UDITPA states that, if any of its provisions conflict with the provisions of the Multistate Tax Compact, which Oregon has adopted, then the provisions of [Oregon] UDITPA control. ORS 314.606.") (Alterations added.). Inconsistent is defined, in relevant part, as "lacking consistency : incompatible, incongruous, inharmonious: as *** of propositions, ideas, beliefs : so related that both or all cannot be true or containing parts so related[.]" *Webster's Third New Int'l Dictionary* 1144 (unabridged ed 2002).

---

[7] Recall that ORS 314.605 to 314.675 are Oregon UDITPA. *See* 22 OTR at 134 n 6.

As an initial matter, the statutory formulas provided in Oregon UDIPTA and the Compact are inconsistent, as both provide that "all business income shall be apportioned" according to their respective formulas. ORS 305.655, Art IV, § 9; ORS 314.650. As to the same taxpayer at the same time, both "cannot be true." The Compact Election did not resolve an inconsistency. It neutralized any inconsistency through the use of an election.

In taxpayer's view, ORS 314.606 provides two formulas and inconsistency is determined by looking to the Compact, including the Compact Election. In the department's view, inconsistency is determined by looking at the Compact and Oregon UDITPA apportionment formulas without regard to the Compact Election. The court finds that both interpretations are reasonable. As such, the plain text of the statute is ambiguous. Context and legislative history resolve this ambiguity.

The context of the statute shows that the legislature intended ORS 314.606 to disable the Compact Election. The context of ORS 314.606 includes ORS 305.655 and Oregon UDITPA. Under taxpayer's view, there could never be an inconsistency for which ORS 314.606 would apply—thus, ORS 314.606 would be meaningless. That is not an acceptable reading. *Vaughn v. Pacific Northwest Bell Telephone*, 289 Or 73, 83, 611 P2d 281 (1980). Therefore, taxpayer's position must be rejected after examination of the context.

The legislative history of ORS 314.606 further supports the department's view that the legislature intended to effectively disable the Compact Election when it enacted that provision. Testimony by department personnel and the Legislative Revenue Office at multiple committee meetings to House Bill (HB) 2058 (1993) shows that the legislature intended that result.

The department's summary report, submitted as written testimony, stated that section 20 of the bill (which would become ORS 314.606) was proposed so that "the provisions in the customary apportionment statutes take precedence over any inconsistent provisions contained in the [Compact]." House Committee on Revenue and School

Finance Subcommittee on Income Taxation, HB 2058, Jan 26, 1993. (*See* Def Ex B at 76.) That "solution" was to address the "problem" where "[t]he [Compact] sometimes differs from the customary apportionment provisions of [Oregon UDITPA], most notably in the double-weighted sales factor and the constitutional violation requirement for the existence of distortion." *Id.*[8]

        Testimony before the House Subcommittee on Income Taxation on January 28, 1993, lends further support to this understanding:

> Don O'Meara, DOR:  Section 19 just refers to where Section 20 ends up in the Oregon Revised Statutes. Section 20, we are a part of and Oregon has adopted the multistate compact for corporations as it applies to the apportionment of income between the states. And we also have our own Oregon statutes regarding this, and, regarding the apportionment of income. Excuse me, this measure would clarify that the Oregon provisions specifically would take precedence over the provisions of the compact where there is any conflict. A couple of specific examples that are listed is in the, there is a standard three factor formula for apportioning income that is sales, property and payroll. Oregon currently double weights the sales factor of those three factors, gives double weighting to that as opposed to the other two factors. And the multistate compact does not do that. What this—this would clarify that our double weighted sales method would take precedence for Oregon over that multistate compact.

> Jim Bucholz, DOR:  If I may, I'm Jim Bucholz, without this change it's not clear the taxpayers may have the option to use the three factor or the four factor formula. And we want them all to be on the same playing field.

        The discussion before Senate Committee on Revenue and School Finance on May 3, 1993, is likewise supportive of the department's view:

> Don O'Meara, DOR:   Section 20 is there to—it states that in corporations of states that are apportioning corporate income it states that our statutes takes precedence over any Multistate Tax Commission rules that might be in conflict. Specifically, this would say that the double weighted

---

[8] The constitutional violation requirement is not at issue in this case.

sales factor in the Oregon, in Oregon statute overrules the MTC rules.

Jim Manary, Legislative Liaison, DOR:　You have, I can't remember, a number of decades ago you adopted in statute the uniform act for multistate corporations. In the uniform act, the provision for the apportionment, the multistate income is the basic three factor formula, property, payroll and sales. And then more recently you specifically changed the sales factor to double weighted and so what you have now in statute is in one part of the statute you have the uniform act which says it's the basic three and then you have specifically have said we want to double-weight sales. We put this in here to say that when you specifically do something different than the uniform act, what you've specifically done controls, not the uniform act. That's why we have—the testimony and the intent we thought was to use double-weighted sales otherwise you have both in the law and it's unclear whether a taxpayer could actually take a choice, either double-weight or not double-weight depending on their circumstance, there's two statutes in there. So this is to say that when you specifically change something from the uniform act that controls.

　　　Finally, the Senate Revenue and School Finance July 13, 1993, hearing further confirms this reading:

Dick Yates, Legislative Revenue Office:　Again Section 19 is again a connect date or an application date—or excuse me, Section 19 adds Section 20 to Oregon law. What you have in Chapter 305 is the Multistate Tax Compact essentially copied in full. And what you have in Chapter 314, which relates to income taxes generally, both corporate and personal, are specific provisions particularly relating to how income is apportioned to Oregon. And what this section says is if there is an inconsistency in the law as it appears in those two chapters that you take—you give precedence to the—or preference to the Oregon statutes in Chapter 314. So you follow what you've said to do specifically rather than what's in the tax compact. This would relate to for example double weighting of the sales factor. The Multistate Tax Compact uses a three factor formula and Oregon law now provides for the double weighting of the sales factor.

　　　There is no indication in the record that there was any contrary legislative history.

This review of the legislative history resolves the issue of legislative intent. The court has no doubt that the legislature intended to disable the Compact Election when it enacted ORS 314.606.

B.   *The Full Text Provision*

Taxpayer argues that if ORS 314.606 effectively disabled the Compact Election, the legislature's adoption of the statute necessarily violated the Full Text Provision. That section provides: "No act shall ever be revised, or amended by mere reference to its title, but the act revised, or section amended shall be set forth, and published at full length." Or Const, Art IV, § 22.

An act that is "original in form, and complete in itself, exhibiting on its face what the law is to be, its purpose and scope, is valid, notwithstanding it may, in effect, change or modify some other law upon the same subject." *Warren v. Crosby*, 24 Or 558, 561-62, 34 P 661 (1893). The policy behind the provision is as follows:

> "The evil it sought to remedy was the mode in which the legislative power was sometimes exercised in the enactment of revisory or amendatory laws. This evil, as is well known, was the practice of amending or revising laws by additions or other alterations, which, without the presence of the original law, were usually unintelligible. Acts were passed, amending an existing statute by substituting one phrase for another, or by inserting a sentence, or by repealing a sentence, or a part of a sentence, in some portion or section thereof, which, as they stood, often conveyed no meaning, and, without examination and comparison with the original statute, failed to give notice of the changes effected. By such means an opportunity was afforded for incautious and fraudulent legislation, and endless confusion was introduced into the law. Legislators were often deceived, and the public imposed upon by such modes of legislation."

*Id.* at 561. In *Warren*, a state statute restructured local taxation and repealed all earlier local taxation ordinances. *Id.* at 558-60. The statute was a complete, independent act of legislation; it granted county officials the power to assess and collect tax, and it expressly repealed all other local property

tax assessment laws. *Id.* at 564. The act did not purport to amend any earlier statute. As such, it did not violate the constitutional prohibition.

Article IV, section 22, does not prohibit amendments or repeals by implication. Where an earlier statute required legal guardians to provide clothing for inmates, a later statute providing the opposite was an implied repeal of the earlier one and thus did not violate the provision. *In re Idleman's Commitment*, 146 Or 13, 27 P2d 305 (1933); *see also Gilbertson et al v. Culinary Alliance et al*, 204 Or 326, 282 P2d 632 (1955) (statute providing that earlier act "shall not be applicable" to later act was repealed by implication that did not violate the provision). Where an earlier statute provided that it was the exclusive method for nominating candidates for office, a later statute expressly providing an alternate method repealed by implication the exclusivity provision of the earlier statute and was not violative of the Full Text Provision. *Patton v. Withycombe*, 81 Or 210, 159 P 78 (1916).

As noted above, ORS 314.606 provides that "[i]n any case in which the provisions of ORS 314.605 to 314.675 are inconsistent with the provisions of ORS 305.655, the provisions of ORS 314.605 to 314.675 shall control." It does not purport to amend the Compact; rather, it provides a tie-breaker for inconsistencies between UDITPA and the Compact. It is an independent, complete law. It does not repeal the Compact Election, but, rather, effectively disables the Compact Election. However, even if the court were to find that it did repeal the Compact Election by implication, that would not offend the constitutional limitation under the Full Text Provision.

Passage of ORS 314.606 did not violate the Full Text Provision.

C.   *The Oregon Contract Clause*

The Oregon Contract Clause provides: "No * * * law impairing the obligation of contracts shall ever be passed." Or Const, Art I, § 21. Taxpayer argues that the Oregon legislature's action in adopting the Compact created a statutory contract, the obligations of which are impaired

by ORS 314.606. The four questions a court asks to determine whether a law violates the obligation of contracts, including statutory contracts, are: "(1) is there a contract?; (2) if so, what are its terms?; (3) what obligations do those terms require?; and (4) has the state impaired an obligation of that contract?" *Moro v. State of Oregon*, 357 Or 167, 194, 351 P3d 1 (2015) (citing *Strunk v. PERB*, 338 Or 145, 170, 108 P3d 1058 (2005)). Recent Oregon cases addressing the public pension system, such as *Moro*, have not had to determine whether, in fact and in law, there was a contract. In all such cases the existence of a contract was a settled conclusion based on prior decisions. In the case before this court the existence of a contract is not settled and possibly determinative.

In analyzing whether a contract exists, this court looks to general contract law rules; however, when a state is a party to a purported contract, the court "supplement[s] the general rules of contract law with additional considerations informed by the state's role serving the public." *Id.* The state may legislatively bind itself to a contract as long as it is not "contract[ing] away its police powers or limiting its power of eminent domain." *Id.* at 195 (citing *Hughes*, 314 Or at 14) (internal citation and quotation marks omitted). However, the Oregon legislature may bargain away its power to tax and spend. *Hughes*, 314 Or at 14 (citing *Eckles v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988)).

D.  *Existence of a Contract Under Oregon Law—the Question of Illusory Promise and Consideration*

For a statutory contract to exist, traditional elements of a contract must be present, including offer, acceptance, and consideration.[9] *Moro*, 357 Or at 195-97; *Hughes*, 314 Or at 14.

> "Consideration is defined as some right, interest, profit, or benefit to the promisor \*\*\* or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the promisee \*\*\*. *Shelley v. Portland Tug & Barge Co.*, 158 Or 377, 387, 76 P2d 477 (1938); *Cummings*

---

[9] This court sees no reason to discuss offer and acceptance as elements of the analysis. Neither party has raised a question on those elements.

*v. Central Oregon Bank et al.*, 110 Or 101, 103, 223 P 236 (1924). 'Benefit' means that the promisor has, in return for the promise, acquired some legal right to which he or she would not otherwise have been entitled. *Shelley*, 158 Or at 388. 'Detriment' means that the promisee has, in return for that promise, forborne some legal right that he or she would otherwise have been entitled to exercise."

*Emmert v. No Problem Harry, Inc.*, 222 Or App 151, 155, 192 P3d 844 (2008). Under the *Restatement (Second) of Contracts*, consideration may be found where parties exchange reciprocal promises. *Restatement (Second) of Contracts* §§ 71, 75 (1981). Oregon courts follow the *Restatement*. *See Stovall v. State of Oregon*, 324 Or 92, 124, 922 P2d 646 (1996) (citing *Restatement* § 71 cmt e). Neither party suggests that any purported consideration other than purported reciprocal promises was present in the formation of the Compact. No Compact member state paid money or gave up anything other than the purported promise to participate in the Compact.

In recent Oregon cases, statutory contract consideration was concededly present. In the PERS litigation cases, the employees worked in exchange for promised pension benefits. In *Eckles*, employers seeking to enforce the statutory contract made payments into a state accident insurance fund that they otherwise were not obligated to make. Indeed, in *Eckles*, the court noted that the state's purpose in enacting the statute at issue was to "induce skeptical employers" to participate in the fund. *Eckles*, 306 Or at 393. This court has had occasion in the past to apply these principles. *Klinger v. Dept. of Rev.*, 21 OTR 347, 354 (2014).

The Compact presents a particular problem as to the existence of consideration. This is because Article X(2) permits any member state to withdraw from the Compact at any time. This right is not dependent on any condition or procedural requirement outside the control of a withdrawing state. In such a case, the question is whether the promises that taxpayer alleges the State of Oregon and other states purportedly made are illusory promises. That question implicates the principles set forth in sections 2 and 77 of the *Restatement*. Oregon follows the principles of the *Restatement*. *See Furrer v. Southwestern*

*Oregon Community College*, 196 Or App 374, 380 n 1, 103 P3d 118, 121 (2004) (citing *Restatement* § 2 cmt e); *Medak v. Hekimian*, 241 Or 38, 41-42, 404 P2d 203 (1965) (citing *Restatement (First) of Contracts* § 79 & illus 1 (1932), comparable to *Restatement (Second) of Contracts* § 77 and illustrations thereunder).

Section 77 of the *Restatement* provides:

"A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless

"(a)   each of the alternative performances would have been consideration if it alone had been bargained for; or

"(b)   one of the alternative performances would have been consideration and there is or appears to the parties to be a substantial possibility that before the promisor exercises his choice events may eliminate the alternatives which would not have been consideration."

As the commentary to the provision elucidates, "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." *Restatment* § 77 cmt a. The illustrations to the *Restatement* provision show that the unfettered right to terminate an agreement without notice leads to a failure of consideration: "A promises B to act as B's agent for three years from a future date on certain terms; B agrees that A may so act, but reserves the power to terminate the agreement at any time. B's agreement is not consideration, since it involves no promise by him." *Id.* illus 2; *see also id.* cmt b, illus 4 (no consideration where right to terminate without notice at any time); *id.* illus 5 (consideration present where right to terminate on 30 days notice because "he promises to continue the agency for at least 30 days").

*Williston on Contracts* provides as to this doctrine:

"Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. Even if it were recognized by law, it would impose no obligation, since the promisor always has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promisee. In such cases, where the

promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration.

"\* \* \* \* \*

"[A] promise to employ as long as it suits the employer will not serve as consideration for the employee's return promise. Similarly, in any case where a promise in terms or in effect provides that the promisor has a right to choose one of two alternatives, and by choosing one will escape without suffering a detriment or giving the other party a benefit, the promise is not consideration. It is for this reason that a promise, in a bilateral agreement, under which the promisor expressly reserves to itself the right of immediate cancellation at any time is not consideration. Where, however, the right to cancellation is tempered by its terms, express or implied, or by operation of law, so that cancellation is not solely at the whim of the promisor, the promise may serve as consideration."

3 *Williston on Contracts* § 7:7 (4th ed 2008). Oregon courts follow the same principles. A "provision giving party unlimited discretion to relieve itself of [an] obligation under [a] contract render[s] [that] contract illusory." *Furrer*, 196 Or App at 380 n 1 (citing *Shannon v. Mathers*, 271 Or 148, 152, 531 P2d 705 (1975)).

Section 2 of the *Restatement* contains related provisions. In relevant part, it states:

"A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."

The relevant commentary to section 2 is as follows:

"Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance."

*Restatement* § 2 cmt e. Oregon courts have followed this doctrine. *See Furrer*, 196 Or App at 380 n 1 (citing *Restatement* § 2 cmt e).[10]

Courts applying the principles of section 2 have concluded that apparent undertakings leaving with a party an unconditional right of cancellation or withdrawal involve no promise at all. Where a purported promisor reserves the right to determine the nature or extent of its performance, no promise, and hence no consideration, is given. *Davis v. General Foods Corporation*, 21 F Supp 445, 446 (SDNY 1937) (internal citations omitted). One court has characterized such a statement as constituting merely a statement that "I will if I want to." *In re Adirondack Ry. Corp.*, 95 BR 867, 874 (Bankr NDNY 1988) (internal citation omitted).

The fact that the withdrawal provision in Article X(2) provides "[n]o withdrawal shall affect any liability already incurred by or chargeable to a member state prior to the time of such withdrawal" does not change the analysis. First, this is merely a statement and does not even purport to be an undertaking by any member state. Second, the statement does not alter the fact that each state can determine the nature and extent of its performance by choosing when to withdraw. The statement does not express a condition precedent to the right of withdrawal. Rather, the statement describes a limited consequence of the unconditional right of a state to suspend performance at its own discretion. In context, *see* ORS 305.655, Arts VI, § 4, VIII, § 2, the reference to "liability already incurred by or chargeable to a party state" is a liability to the Commission or other member states for dues or the costs of common audit. The court concludes that the provision provides no more than what would otherwise be available to other member states in *quantum meruit* or quasi contract. But a remedy in *quantum meruit*

---

[10] The *Restatement* acknowledges that where there is a legitimate reliance interest, that interest may be protected. *Restatement* § 90 (1981). However, there is no reliance interest shown here. Taxpayer has made no showing of a reliance interest of other states. Nor has it shown that it structured its affairs in reliance on use of a specific apportionment formula. Indeed, it paid its taxes under the single sales factor and only later amended its return to claim the benefit of the three-factor formula under the Compact.

is not a remedy arising from an express contract. *Ken Hood Construction v. Pacific Coast Construction*, 203 Or App 768, 772, 126 P3d 1254, *rev den*, 341 Or 366 (2006). The same is true for a remedy in quasi contract. *Kashmir v. Patterson*, 289 Or 589, 591, 616 P2d 468 (1980).

The withdrawal provision renders any purported promises illusory.[11] No contract was formed by the states adopting the Compact.[12]

E.  *Existence of a Contract under Oregon Law—Other Terms and Reflection of Intent*

Even if consideration adequate to support enforcement were present in the Compact, the terms of the Compact do not bar the adoption by states of amendments or disabling legislation.

A canon for construction of statutory contracts is that one "will not be inferred from legislation that does not unambiguously express an intention to create a contract." *Hughes*, 314 Or at 14; *see Moro*, 357 Or at 195. This high bar is placed in the analysis due to the fact that, as a general rule, a legislature is not considered to act so as to bind future legislatures. *See Hughes*, 314 Or at 13.[13] While there

---

[11] As taxpayer concedes, "[t]his is not the type of contract where the parties exchange obligations[.]" The court is unaware that there are any other kinds of contracts.

[12] In many cases where a party seeks to establish illusory promises, courts conclude that the implied covenant of good faith and fair dealing supplies the necessary restriction on the apparent ability of a party to solely determine the nature and extent of its performance. *E.g., Shannon v. Mathers*, 271 Or 148, 152, 531 P2d 705 (1975); *Pacific Pines Constr. v. Young*, 257 Or 192, 477 P2d 894 (1970). The doctrine that an implied covenant exists is not inconsistent with the law of contracts among private parties, and it may even be applicable in contracts in which a state is a party and where such things as goods or services are the subject of the contract. It can, however, have no place when the question is whether a statutory contract binding later legislatures exists. In those cases the test of clear and unambiguous expression does not permit implication of terms. *See* 22 OTR at 146-47 n 13.

[13] This rule is no mere formality. It is premised upon the fundamental notion in a republican form of government that legislatures are representative bodies that should, except in unusual situations, respond to the wishes of their constituencies. They should not be governed by the policy choices of prior legislative bodies with potentially different constituencies or constituencies with different policy choices. As the United States Supreme Court has observed:

"This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but

may be exceptions to the general rule, they must be demonstrated clearly and unambiguously.

In determining whether a statute constitutes or embodies a contract, "primary importance" is given to the text and context of the statute. *Hughes*, 314 Or at 24-26. Use of mandatory words like "shall" can be indicative of legislative intent to bind future legislatures through a statutory contract term. *Strunk*, 338 Or at 220-21; *see Moro*, 357 Or at 210. Furthermore, "doubtful cases should be resolved in favor of finding a provision is not a term of the contract[.]" *Moro*, 357 Or at 204.

1.  *Express Terms*

Without dwelling on what has already been discussed, the withdrawal provisions of the Compact are perhaps the single greatest indication that the parties did not intend any member state to be contractually committed. The law of illusory promises is based on what the courts have said about what reasonable persons can and cannot rely upon and what "promises" the law will enforce. This doctrine should also inform the decisions of courts about what legislators employing such language intended in terms of contractual commitments binding upon later legislatures.

At the outset, it bears observing that there is, in fact, nothing in the Compact that says member states may not amend or disable provisions of the Compact or that only withdrawal was available to a state that did not wish to continue providing the Compact Election. In 1959, prior to action on the Compact, the Oregon legislature adopted the Interstate Compact on Juveniles. *See* ORS 417.010 - 417.080.

---

to make laws that establish the policy of the state. *Indiana ex rel. Anderson v. Brand*, 303 US 95, 104-05, 58 S Ct 443, 447-48, 82 L Ed 685 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, '[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.' *Keefe v. Clark*, 322 US 393, 397, 64 S Ct 1072, 1074, 88 L Ed 1346 (1944) (quoting *Charles River Bridge v. Warren Bridge*, 11 Pet 420, 548, 9 L Ed 773 (1837))." *Nat. R. Psngr. Corp. v. A. T. & S. F. R.*, 470 US 451, 466, 105 S Ct 1441, 84 L Ed 2d 432 (1985) (internal quotation marks omitted).

That compact specifically addresses and limits amendments. Amendment may be made only by unanimous agreement. *See* ORS 417.040, Art X(C). Legislatures obviously can provide for restrictions on amendment if they wish to do so. No such restriction is found in the Compact. And, as the court in *Hughes* noted, the job of the court in construing a statute is "*not to insert what has been omitted*, or to omit what has been inserted." *Hughes*, 314 Or at 28 (quoting ORS 174.010) (emphasis in original).

ORS 305.655 provides that the Compact is "hereby enacted into law[.]" Of course, legislatures enact many bills into law each session. And legislators obviously know that prior law can be amended. The court must assume that the members of those legislatures are aware of the rule as to when legislation contains an enforceable agreement binding future legislatures. *See Mastriano v. Board of Parole*, 342 Or 684, 693, 159 P3d 1151, 1155 (2007) (legislators presumed to enact laws "in light of existing judicial decisions that have a direct bearing on those statutes"); *Rorick v. Dalles City*, 140 Or 342, 346-47, 12 P2d 762, 763 (1932) (legislature presumed to know of restrictions in municipal bond statute when it passed law subject to those restrictions). Accordingly, a statement that something is "enacted into law," without more, most likely supports a conclusion that the Oregon legislature using those words considered itself to be adopting a malleable law and not a statutory contract, binding future legislatures.

The Compact's purposes as described in Article I are to "facilitate" and "promote" uniformity, convenience, and determination of tax liability. There is no statement that a purpose is to guarantee any of such values or results.

As to uniformity, which appears to be the overriding value, at least for taxpayers, the court notes that adoption of the Compact came shortly after the adoption by Oregon of UDITPA. Or Laws 1965, ch 152, § 10 (adoption of Oregon UDITPA, later codified as ORS 314.650); Or Laws 1967, ch 242, § 1 (adoption of the Compact, later codified as ORS 305.655). Oregon's adoption of UDITPA was for the purpose of making "uniform the law of those states which enact it." ORS 314.605(2). Yet, everyone understood that UDITPA was not

binding on states adopting it.[14] That being the case, it is difficult for the court to conclude that the Compact—the primary purpose for the adoption of which was also uniformity—would be understood by those adopting it as suddenly importing not only a hope or aspiration, but also a contractual commitment.

There are facts indicating that when it adopted the Compact, the Oregon legislature likely thought it had enacted a uniform law. The express terms of the Compact's apportionment formula came verbatim from UDITPA. *See* Or Laws 1965, ch 152, § 10; Or Laws 1967, ch 242, § 1. The legislative history shows that the Oregon legislature in adopting the Compact likely thought it was adopting UDITPA in another form. In the "Tax Commissioner's Explanation," contained within the legislative history to the original enactment of the Compact, there is a statement that the Compact "allows taxpayers the choice of apportionment on the basis of the particular apportionment tax policies already adopted by a state, or on the basis of the Uniform Division of Income for Tax Purposes Act (adopted by Oregon in 1965 as a part of this program), which is made a part of the [C]ompact." Testimony, Joint Ways and Means Committee, HB 1124, Mar 10, 1967, Ex 4. Such legislative history creates at least an inference that the Oregon legislature thought it was going no further than legislating with respect to a "uniform act" as malleable as UDITPA itself.[15]

---

[14] Indeed, Oregon and other states altered UDITPA, both very early in its existence as well as later. As to earlier changes, Alaska, Arkansas, Idaho, Kansas, and South Carolina all adopted UDITPA before Oregon. 7 *Uniform Laws Annotated* 365 (West 1970). As the general statutory notes annotation to UDITPA shows, Idaho and South Carolina altered provisions of UDITPA early on, with Idaho adding provisions not found in UDITPA and South Carolina adopting only some provisions. *Id.* at 366. A review of specific provisions shows many variations from the official text as of that time. *See, e.g.*, *id.* at 368 (as to their respective UDITPA sections 1, Alaska omitted a definition and Arkansas added a provision), 376 (Kansas omitted a provision of section 14 in its version of UDITPA). Many states subsequently amended their respective UDITPA statutes. *See, e.g.*, 1987 Minn Laws 1112-19; 1991 Mich Pub Acts 325-26; 1993 Cal Stat 5441; 1994 Idaho Sess Laws 945-53; 1995 Ark Acts 3005-06; 2008 Colo Sess Laws 953-59; 2010 Utah Laws 754-55.

[15] Indeed, the United States Supreme Court referred to the Compact as a model act. *U. S. Steel Corp. v. Multistate Tax Comm'n*, 434 US 452, 456 n 5, 98 S Ct 799, 54 L Ed 2d 682 (1978) ("The model Act proposed as the Multistate Tax Compact, with minor exceptions, has been adopted by each member State."). This shows that others, when confronted with examining the Compact, thought of it as more in the nature of a uniform act.

As discussed above, a statutory contract "will not be inferred from legislation that does not unambiguously express an intention to create a contract." *Hughes*, 314 Or at 14. Given the foregoing express terms, it is by no means "unambiguously" clear that the Oregon legislature that enacted the Compact into law intended thereby to contractually bind future legislatures.

2. *Course of Conduct of Member States*

As mentioned above, the court is aided in its consideration of the intent of the Oregon legislature reflected in the terms of the Compact by the actions of the states who adopted the Compact and operated under it. Course of conduct can help answer the question of whether the parties to the Compact intended to allow others to amend or disable provisions of the Compact.

Oregon courts have long held that the course of conduct of parties to an agreement can explain the meaning of the terms of such an agreement. *Perkins v. Standard Oil Co.*, 235 Or 7, 14-16, 383 P2d 107, *reh'g den*, 383 P2d 1002 (1963) ("The course of conduct pursued by parties in their performance of a contract, especially in a situation such as this where performance covered a course of years and involved extensive efforts, is frequently a reliable exponent of its meaning."); *Krieg v. Union Pacific Land Res. Corp.*, 269 Or 221, 229-30, 525 P2d 48 (1974) ("The conduct of the parties to a contract and their practical interpretation of it is an important factor when there is a dispute over its meaning."). Indeed, the conduct of parties that is inconsistent with a purported agreement is a "significant, and sometimes controlling, factor." *Bruckman v. Breitenbush Hot Springs*, 272 Or 1, 15, 534 P2d 971 (1975) (citing *Jenkins v. AAA Heating*, 245 Or 382, 385, 421 P2d 971 (1966); *Wallowa Valley Stages v. Oregonian*, 235 Or 594, 597, 386 P2d 430 (1963)); *see also Jenkins*, 245 Or at 385 ("If the conduct of the parties to the questioned agreement is inconsistent with their written declaration, their conduct will control.").

Under the parol evidence rule, there must be an ambiguous contract provision at issue in order for a court to consider extrinsic evidence of meaning. *See Yogman v. Parrott*, 325 Or 358, 363-64, 937 P2d 1019 (1997) (citing

ORS 41.740); *Harris v. Warren Family Properties, LLC*, 207 Or App 732, 738-39, 143 P3d 548, 551-52 (2006) (quoting ORS 41.740). Furthermore, extrinsic evidence of the parties' conduct does not include one party's unilateral conduct. *Andrews v. Sandpiper Villagers, Inc.*, 215 Or App 656, 667, 170 P3d 1098, 1104 (2007).[16]

As to these rules restricting the use of parol evidence, the court has already concluded that there is at least ambiguity as to both the intent of the states which adopted the Compact as well as the meaning of the Compact. Further, as will be detailed below, much more than unilateral conduct has been involved in the behavior of member states to the Compact.

Indeed, the course of conduct of the member states shows that they did not intend for the Compact Election to be an irrevocable term of the Compact. Nor did they intend the withdrawal provision to preclude action to amend or disable the Compact Election. These facts also demonstrate that the member states did not intend to bind each other.

Member states were able, almost from the beginning, to alter or disable the provisions of the Compact. Florida in 1971—four years after its adoption of the Compact—amended the Compact provisions that applied to it and repealed Articles III and IV of the Compact. 1971 Fla Laws, ch 71-980, § 1 (repeal); *see* 1967 Fla Laws, ch 67-598, § 1 (original adoption). The other 20 regular member states unanimously approved this action, finding that "the State of Florida be recognized as a regular member in good standing of the Multistate Tax Compact and the Multistate Tax Commission." Minutes of the Meeting of the Multistate Tax Commission, Resolution No. 1 (Dec 1, 1972).

Later, other states began to do the same without asking permission, to which no other states, apparently, objected. In 1987, Minnesota increased its sales factor weighting from one-third to 70 percent and amended its

---

[16] It is not clear that rules such as application of the parol evidence rule apply in the context of statutory contracts where determination of the Oregon legislature's unambiguous expression of intent is paramount. However, even if the rule applies, it will not prevent consideration of extrinsic evidence here because, as discussed below, there is an ambiguity and the conduct at issue was far from unilateral.

version of the Compact to remove Articles III and IV. 1987 Minn Laws 1098-1119. It has gradually moved to single sales factor from 2007 to 2013. *See* Minn Stat § 290.191(2)(b). In 1993, California double-weighted its sales factor and effectively disabled the Compact election. Cal Rev & Tax Code, § 25128; 1993 Cal Stat 5441. As discussed above, Oregon in 1993 effectively disabled the Compact Election with ORS 314.606. Or Laws 1993, ch 726, § 20. In 1994, Idaho increased to a double-weighted sales factor and effectively disabled the Compact election. Idaho Code Ann § 63-3027(i)(l); 1994 Idaho Sess Laws 945-53. In 1995, Arkansas double-weighted the sales factor and amended the Compact. Ark Code Ann § 26-51-709; Ark Code Ann § 26-5-101; 1995 Ark Acts 3005-06. In 2009, Colorado moved to single-sales factor apportionment and repealed the Compact Election. Colo Rev Stat § 39-22-303; Colo Rev Stat § 24-60-1308; Colo Rev Stat § 24-60-1301; 2008 Colo Sess Laws 953-59. In 2010, Utah gradually began moving to single-sales factor while eliminating the Compact Election. Utah Code Ann § 59-7-311; 2010 Utah Laws 745-47, 754-55. Alabama moved to double-weighted sales factor in 2012 by directly amending the Compact. 2011 Ala Laws 1394, 1399.[17]

As the department notes, the MTC's Executive Director stated that "[o]ver the history of the Multistate Tax Commission, the Commission has never expelled or otherwise sanctioned a member state because it adopted a position that varied from that of the model Compact."

The conclusion is inescapable. By action of individual member states and acquiescence by other member states, provisions of the Compact Election have been amended or effectively disabled by many states. This has been done with, and allowed by, actions other than withdrawal.[18]

---

[17] Furthermore, other state courts when examining the Compact have determined that it was "never intended by anyone to be a substantive tax statute." *Goldberg v. State Tax Com'n*, 639 SW2d 796, 799 (Mo 1982); *Burton Mfg. Co., Inc. v. State*, 469 So 2d 620, 622 (Ala Civ App 1985) (quoting *Goldberg*, 639 SW2d at 799); *Land O'Frost, Inc. v. Pledger*, 308 Ark 208, 211-12, 823 SW2d 887, 889-90 (1992) (quoting *Goldberg*, 639 SW2d at 799).

[18] Thus, unlike *Moro*, which concerned the elements regarding terms, obligation, and impairment, the court finishes with the first element—whether a contract exists. As noted above, existence of a contract in *Moro* was a settled conclusion based on prior decisions.

### 3.   *Conclusion as to Oregon Contract Clause*

This court concludes that no contract was formed by the actions of the states that adopted the Compact. The provisions of the Compact and the rights the member states reserved to themselves with respect to withdrawal indicate that they did not make promises to one another of the type the law will enforce. Further, the provisions of the Compact do not clearly and unambiguously indicate an intention to bind the future legislatures of the states.

Any doubt as to these conclusions is removed when the actions of the member states in amending the Compact and disabling Compact terms are considered. No state objected to such actions on the part of other states. The states, in adopting the Compact, did not rely on undertakings of the other states—a fact fully supported by the actions of all member states following adoption of the Compact.[19]

The court concludes that the Compact does not contain reciprocal promises among the member states such that a contract among those states could be formed. There being no contract among the states, the claim of taxpayer that it has third-party beneficiary rights and remedies that have been impaired in violation of the Oregon Contract Clause founders on the same basic contract principles.

## F.   *Federal Statute*

Taxpayer points to no federal statute containing a procedural or substantive limitation on the actions of the Oregon legislature in adopting ORS 314.606. The Compact, not having been approved by Congress, does not have the status of a federal law. *Cuyler v. Adams*, 449 US 433, 438, 101 S Ct 703, 66 L Ed 2d 641 (1981); *McComb v. Wambaugh*, 934 F2d 474, 479 (3d Cir 1991).

## G.   *The Federal Contract Clause*

The Federal Contract Clause provides: "No State shall \*\*\* pass any \*\*\* Law impairing the Obligation of Contracts[.]" US Const, Art I, § 10. The United States

---

[19] Analysis of the court does not require concept of waiver be addressed, but it would be a defense if other conclusions were reached as to contract formation. *See, e.g.*, *Bennett v. Farmers Ins. Co.*, 332 Or 138, 156, 26 P3d 785 (2001).

Supreme Court has interpreted this provision as requiring a determination of "whether the change in state law 'operated as a substantial impairment of a contractual relationship.'" *General Motors Corp. v. Romein*, 503 US 181, 186, 112 S Ct 1105, 117 L Ed 2d 328 (1992) (citing *Allied Structural Steel Co. v. Spannaus*, 438 US 234, 244, 98 S Ct 2716, 2722, 57 L Ed 2d 727 (1978); *Energy Reserves Group v. Kansas Power & Light*, 459 US 400, 411, 103 S Ct 697, 704, 74 L Ed 2d 569 (1983)). The inquiry is three-fold: (1) whether a contractual relationship exists; (2) "whether a change in law impairs that contractual relationship"; and (3) "whether the impairment is substantial." *Id.*

Whether there is a contract for purposes of Federal Contract Clause analysis is a federal question but is determined with "respectful consideration and great weight" to the determination of the highest court of the state. *Romein*, 503 US at 187 (citing *Indiana ex rel. Anderson v. Brand*, 303 US 95, 100, 58 S Ct 443, 446, 82 L Ed 685 (1938); *Irving Trust Co. v. Day*, 314 US 556, 561, 62 S Ct 398, 401, 86 L Ed 452 (1942)). The United States Supreme Court "has asserted power to construe for itself the disputed agreement, to decide whether it is a contract, and to interpret the subsequent state statute to decide whether it impairs that contract." *Dyer v. Sims*, 341 US 22, 33 n 3, 71 S Ct 557, 563, 95 L Ed 713 (1951) (Reed, J., concurring) (citing *Appleby v. City of New York*, 271 US 364, 380, 46 S Ct 569, 573, 70 L Ed 992; *King Mfg. Co. v. Augusta*, 277 US 100, 114, 48 S Ct 489, 494, 72 L Ed 801; *Coombes v. Getz*, 285 US 434, 441, 52 S Ct 435, 436, 76 L Ed 866). However, it will "accept state court conclusions unless 'manifestly wrong.'" *Id.* (citing *Hale v. State Board*, 302 US 95, 101, 58 S Ct 102, 103, 82 L Ed 72). Ultimately, while it is a federal question, it appears that the determination of whether there is a contract under state law would ordinarily be determined under state law, subject to the United States Supreme Court's ability to decide the question independently. In *Appleby*, 271 US at 380, the Court stated:

"In the case before us, the construction and effect of the contract involved in the deeds and covenants depend chiefly upon the extent of the power of the state and city to part with property under navigable waters to private persons,

> free from subsequent regulatory control of the water over the land and the land itself. *That is a state question, and we must determine it from the law of the state* as it was when the deeds were executed to be derived from statutes then in force *and from the decisions of the state court then and since made*; but we must give our own judgment *derived from such sources*, and not accept the present conclusion of the state court without inquiry."

(Emphases added.) *See also Picard v. Members of Employee Retirement Bd.*, 275 F3d 139 (1st Cir 2001) (citing *Romein*, 503 US at 187) ("In evaluating whether a purported contract or property right is entitled to constitutional protection under the \* \* \* Contract Clause, \* \* \* this Court generally looks to state law as interpreted by the state's highest court.").

As for alleged statutory contracts, a statute is treated as a contract "when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."[20] *United States Trust Co. v. New Jersey*, 431 US 1, 17 n 14, 97 S Ct 1505, 52 L Ed 2d 92 (1977) (citing *Dodge v. Board of Education*, 302 US 74, 78-79, 58 S Ct 98, 100, 82 L Ed 57 (1937); *Brand*, 303 US at 104-05). The presumption is against finding a statutory contract. *National R. Passenger Corp. v. A. T. & S. F. R. Co.*, 470 US 451, 466-67, 105 S Ct 1441, 84 L Ed 2d 432 (1985) (quoting *Dodge*, 302 US at 79) ("[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'"). However, where the legislature "'expressly reserved' its rights to 'repeal, alter, or amend [a statute] at any time[,]'" there was no contract. *Id.* at 467 ("This is hardly the language of contract.").

---

[20] It may be worth noting that the cases cited in the text below interpreted federal statutes. In *United States Trust Co.*, the compact was federal law under the Compact and Supremacy Clauses. In *National R. Passenger Corp. v. A. T. & S. F. R. Co.*, 470 US 451, 105 S Ct 1441, 84 L Ed 2d 432 (1985), it was the Rail Passenger Service Act of 1970, a federal statute. However, the First Circuit in *Maine Ass'n of Retirees v. Board of Trustees of Maine Public Employees Retirement System*, 758 F3d 23, 29-30 (1st Cir 2014), applied those cases and their reasoning to a state pension law that was the alleged contract at issue there.

As discussed above, this court finds that no contract exists under Oregon law. This court sees nothing in the cases of the United States Supreme Court that would indicate it would reach a contrary conclusion. It follows that there can be no impairment of contract for purposes of the Federal Contract Clause. The statutory contract analysis discussed in *United States Trust Co.* and *National R. Passenger Corp.*, to the extent it applies, further strengthens this result. In adopting the Compact, all state legislatures expressly reserved the right to withdraw at any time. As the United States Supreme Court stated in *National R. Passenger Corp.*, "[t]his is hardly the language of contract." *Id.*

Even if it were to be decided that the Compact constitutes a contract, in some cases state restrictions do not amount to impairments of the obligation of contract in violation of the Federal Contract Clause.

Under the reserved powers doctrine, a state cannot contract away certain "reserved powers." When a state attempts to bargain away those powers, the purported contract is void. *Id.* at 23-24. Among these are the "police power and the power of eminent domain." *United States Trust Co.*, 431 US at 24. However, a state can "bind itself in the future exercise of the taxing and spending powers." *Id.* at 24 n 21 (citing *State of N. Jersey v. Wilson*, 11 US (7 Cranch) 164, 3 L Ed 303 (1812)). Thus, the reserved power doctrine does not appear to apply in this case.

However, the Federal Contract Clause does not operate as an "absolute bar" when a state subsequently modifies its own "financial obligations." *United States Trust Co.*, 431 US at 25. A state's impairment of its own obligations may still pass constitutional muster if the law is "reasonable and necessary to serve an important public purpose." *Id.* However, "complete deference" is inappropriate because "the State's self-interest is at stake." *Id.* at 26.

In *United States Trust Co.*, states that had adopted a compact approved by Congress repealed an earlier bond covenant providing that the New York and New Jersey Port Authority would not later issue bonds if doing so would impair the creditworthiness of the authority. *Id.* at 8. The state argued that mass transportation, energy conservation,

and environmental protection were sufficient public purposes to justify the repeal. *Id.* at 28-29. The Supreme Court found that those were important public purposes, but the impairment was not reasonable and necessary. *Id.* at 29. Total repeal was unnecessary because less drastic alternatives were available and alternative funding mechanisms could possibly have been used. *Id.* at 29-30.

Importantly, the Court in *United States Trust Co.* contrasted this result with the result in *El Paso v. Simmons*, 379 US 497, 508-09, 85 S Ct 577, 13 L Ed 2d 446 (1965).[21] In *Simmons*, a 19th century statute provided for land grants requiring only a minimal down payment, low annual payments of interest, and virtually unlimited redemption rights after default. *Simmons*, 379 US at 498-99. The purpose of the original statute was to promote settlement. *Id.* at 498-99, 516. As a consequence of the unlimited redemption period, purchasers were able to take ownership positions in potential oil property and hold them for speculative purposes—in effect waiting to see about oil discovery before deciding to redeem or not. *See United States Trust Co.*, 431 US at 31. Due to the rank speculation that followed, the Texas legislature amended the law in 1941, adding a five-year statute of limitations on redemption. *Simmons*, 379 US at 511. After the act was passed, a former property owner whose title traced back to 1910 defaulted, and his attempt to redeem property eight years after default was denied by the city of El Paso because it was beyond the five-year statute of limitations. *Id.* at 500-01.

In finding that the actions of the Texas legislature passed muster under the Federal Contract Clause, the *Simmons* court noted that its prior decisions "have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change." *Id.* at 515 (citing *Honeyman v. Jacobs*, 306 US 539, 59 S Ct 702, 83 L Ed 972; *Gelfert v. National City Bank*, 313 US 221, 61 S Ct 898, 85 L Ed 1299; *East New York Bank v. Hahn*, 326 US 230,

---

[21] The unforeseen benefits or burdens analysis is contained within the Federal Compact Clause analysis of whether a law is "reasonable and necessary to an important public purpose." *See United States Trust Co.*, 431 US at 25, 28-32. Oregon has not decided whether to apply a "reasonable and necessary" prong to the Oregon Contract Clause. *See Moro*, 357 Or at 228-31.

66 S Ct 69, 90 L Ed 34). Furthermore, "[l]aws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract." *Id.* The Court found that the statute of limitations was "clearly necessary" because of the changed circumstances and legislative policies that had moved away from settlement of land and towards school revenues, efficient land utilization, and compliance with contracts. *Id.* at 516.

In the case before this court, dramatic change has also occurred in the world of state taxation of interstate operations since the time the Compact was adopted. At the time of adoption, most states that became parties to the Compact had equally weighted three-factor apportionment formulas no different from what was provided under Article III of the Compact. *See Moorman Mfg. Co. v. Bair*, 437 US 267, 276, 8 S Ct 2340, 57 L Ed 2d 197 (1978); *id.* at 296 n 9 (Powell, J., dissenting).

Then, in a change as dramatic as that of moving from settlement to oil speculation in Texas, the United States Supreme Court issued its decision in *Moorman*. That case involved Iowa, a state that apportioned according to a single sales factor. *Id.* at 269-70. The United States Supreme Court examined whether it was constitutional for an apportionment regime to contain a single sales factor. The taxpayer there argued that because the court had previously approved apportionment of income with the classic three-factor formula, use of a single sales factor produced an unconstitutional result. Nonetheless, the Court found use of a single sales factor to be constitutionally permissible.

In his dissent in *Moorman*, Justice Blackmun observed that the Iowa formula was parochial in nature, favoring in-state business over out-of-state business. *Id.* at 282-83 (Blackmun, J., dissenting).[22] Justice Blackmun also predicted that the majority's conclusion was bound to result in adoption by other states of single sales factor formulas, as they would perceive or imagine "a similar advantage to local interests." *Id.* at 282. To Justice Powell (with whom

---

[22] Iowa was not a member of the Compact. *See Moorman*, 437 US at 282 n 1 (Blackmun, J. dissenting) (citing *U. S. Steel*).

Justice Blackmun joined), the Commerce Clause was meant to prevent just that type of problem. *Id.* at 283-84 (Powell, J., dissenting). The state's legislation, in his view, adopted a xenophobic rule. *Id.* The majority's result would benefit companies within the state that had low percentages of products and services sold in the state and hence lower sales factors in the single sales factor apportionment formula. *Id.* While such a formula would lighten the tax burdens of "domestic" companies, it would tend to increase substantially the tax burdens of companies with relatively more property and work force located outside the state.[23]

The fears of Justice Blackmun were in fact realized. Many states, at the urging of businesses located substantially within their borders, have adopted single or heavily weighted sales factor apportionment. In that process, proponents of the change often argued that the loss of revenue from in-state companies would be offset by the relatively higher amount of tax that would be due from companies having more property and payroll in other states. In the 1950s, the three-factor formula was prevalent. *See id.* at 276; *id.* at 296 n 9 (Powell, J., dissenting). Not long after *Moorman*, it was clear that the world of apportionment was changing.[24]

In adopting single sales factor apportionment formulas, states like Oregon were faced with a potential fiscal disaster unless the provisions of the Compact Election were either amended or disabled. Absent that, in-state taxpayers would reduce their tax burdens by following Oregon UDITPA—namely a single sales factor approach. However, out-of-state taxpayers would elect to file under the three-factor formula of the Compact.[25] The taxpayers would not be treated uniformly. Further, the lack of uniformity would result in both in-state and out-of-state companies getting

---

[23] For an example of how use of a single factor formula creates results favoring in-state over out-of-state taxpayers as compared with the classic three-factor formula, see *Moorman*, 437 US at 282 n 2 (Powell, J., dissenting).

[24] As discussed above, numerous states changed the apportionment formulas in UDITPA and the Compact. *See* 22 OTR at 150-52.

[25] The terms "in-state" and "out-of-state" are not meant to refer to the state of incorporation. Rather, an in-state taxpayer is one with relatively lower percentages of sales as compared with property or payroll. An out-of-state taxpayer is one whose ratios of property and payroll located out of state exceed the ratio of in-state sales.

the most advantageous treatment. Revenue increases from out-of-state companies—expected to offset loss of revenue from in-state companies—would never materialize.[26]

Faced with this possibility, Oregon, like most other states, took steps to look at what past legislatures had enacted and make appropriate changes. It did so to protect its revenue and to place all taxpayers on the same footing.[27] Taxpayer now argues that it may not do so because the legislature that adopted the Compact into "law" must be viewed as adopting a contract in respect of which other states had reasonable expectations of permanency.

Even if the Oregon legislature is considered to have entered into a contract in its adoption of the Compact, the limitation on alteration of that contract found in the Federal Contract Clause must be applied in the same way that it was applied to the Texas legislation in *Simmons*. No party should be subject to "unforeseen advantages or burdens." *Simmons*, 379 US at 515. The party claiming the benefit of a contract must be limited to "gains reasonably expected." *Id.*

Testing taxpayer's view of the Compact against those standards, ORS 314.606 would be subjected to unforeseen burdens. Other states, or persons like taxpayer claiming some benefit from what those other states bargained for, would be receiving an "unforeseen advantage," indeed an advantage none of them to date have sought.

---

[26] As representatives of the department stated in the hearings on the bill that added ORS 314.606, the department expected that the change would benefit in-state companies and hurt out-of-state companies. Tape Recording, House Committee on Revenue and School Finance Subcommittee on Income Taxation, HB 2058, Jan 28, 1991, Tape 006, Side B (statement of Don O'Meara) ("[I]f you tend to be an Oregon corporation then you tend to have property and employment in Oregon so those factors are large. Alright, in double-weighting the sales factor which is likely to be relatively small—is going to tend to reduce the tax on what you might call domestic corporations at the expense of what we might call non-Oregon corporations with little property, little payroll in Oregon but a lot of sales, relatively a lot of sales. So if you double-weight the sales factor those persons, those corporations pay more tax in Oregon."); *id.* (statement of Jim Bucholz) ("[I]t benefits Oregon corporations, domestic corporations at the expense of non-Oregon corporations so I guess it provides a little bit incentive for corporations to remain in Oregon.").

[27] Uniform footing was not a concern at the time of the adoption of UDITPA because, as discussed above, the three-factor formula was nearly universal at that time. *See* 22 OTR at 157-60. Lack of uniformity was an unforeseen burden as well.

*Simmons* also talks of "gains reasonably expected." *Id*. Here again, the sister states have taken no action indicating they expected anything other than the posture in which they find themselves after amendments of disabling legislation. As to parties such as taxpayer, as indicated above, there is nothing in the record that provides any support for a reasonable inference, much less a conclusion, that taxpayer ever expected the actions of the Compact states and the Compact Election to involve a binding agreement. Taxpayer did not change its business practices in any way. Nor did it initially file its returns as it now claims it has a right to do.

The adoption of ORS 314.606 was not a violation of the Federal Contract Clause. This is not to say, however, that other provisions of the United States Constitution may not apply. To the final such provision raised by taxpayers the court now turns.

H.   *Compact Clause*

The Compact Clause provides: "No State shall, without the Consent of Congress, * * * enter into any Agreement or Compact with another State." US Const, Art I, § 10. The Compact Clause does not purport to place a substantive limitation on any state.

The Compact Clause appears to be absolute. However, the procedural requirement of congressional consent only applies to "agreements that are 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.'" *U. S. Steel Corp. v. Multistate Tax Comm'n*, 434 US 452, 468, 98 S Ct 799, 54 L Ed 2d 682 (1978) (quoting *New Hampshire v. Maine*, 426 US 363, 96 S Ct 2113, 48 L Ed 2d 701 (1976)) (internal citation omitted).

Where congressional consent is required, or given, that consent "transforms an interstate Compact within this Clause into a law of the United States," and thus "construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question." *Cuyler v. Adams*, 449 US 433, 438, 101 S Ct 703, 66 L Ed 2d 641 (1981). Interpretation and construction of such compacts

will, notwithstanding the rule in *Erie R. Co. v. Tompkins*, 304 US 64, 82, 58 S Ct 817, 82 L Ed 1188 (1938), create a body of federal common law. *See Petty v. Tennessee-Missouri Comm'n*, 359 US 275, 278, 79 S Ct 785, 794, 3 L Ed 2d 804 (1959) ("The construction of a compact sanctioned by Congress under Art. I, s 10, cl. 3, of the Constitution presents a federal question. *Delaware River Comm'n v. Colburn*, 310 US at 427, 60 S Ct at 1041. Moreover, the meaning of a compact is a question on which this Court has the final say. *Dyer v. Sims*, 341 US 22, 28, 71 S Ct 557, 560, 95 L Ed 713 [(1951)].") Additionally, such compacts become the supreme law of the land under the Supremacy Clause. *Tarrant Regional Water Dist. v. Herrmann*, 569 US 614, 133 S Ct 2120, 2130 n 8, 186 L Ed 2d 153 (2013) (citing *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta*, 458 US 141, 152-53, 102 S Ct 3014, 73 L Ed 2d 664 (1982)) ("The Supremacy Clause *** ensures that a congressionally approved compact, as a federal law, pre-empts any state law that conflicts with the Compact."); US Const, Art VI, cl 2.

If the Compact had received the approval of Congress, there would be no need to satisfy the formation requirements for contracts including consideration. The need to find an unambiguous intent to bind future legislative action by the state would be irrelevant. The congressional approval would create federal law binding on Oregon without regard to its law or constitution. The binding effect of such law would not depend on consideration.

However, compacts that do not require consent do "not express federal law" and thus "must be construed as state law." *McComb v. Wambaugh*, 934 F2d 474, 479 (3d Cir 1991) (citations omitted).[28] In such cases, no congressional consent is given, no paramount federal law is created.

---

[28]  Both sides cite *Northeast Bancorp v. Board of Governors, FRS*, 472 US 159, 105 S Ct 2545, 86 L Ed 2d 112 (1985), discussing the case as if it had some bearing on the case before this court. (*See* Def's Cross-Mot Summ J at 32-37; Ptfs' Resp & Reply at 6-11.) However, that case expressed doubt as to whether a compact was even formed, applying "classic indicia of a compact." *Northeast Bancorp*, 472 US at 175. The court held that even if a compact was formed, the purported compact at issue there did not require congressional consent. *Id.* at 175-76. Determination of whether an agreement exists may well be a necessary first step in the analysis of whether such an agreement requires congressional consent under the Compact Clause. However, that question is irrelevant in the case before this court, as the Compact does not require consent. *U. S. Steel*, 434 US at 468-70.

Further, if a state legislature has not bound itself and future legislatures in a statutory contract, the label of "compact" does not magically supply consideration or clear and unambiguous terms to create a statutory contract.[29]

Taxpayer argues that the Compact Clause contains something more than a procedural limitation applicable in some cases. The position of taxpayer is found in part IV A of taxpayer's Memorandum of Points and Authorities in Support of its motion. Taxpayer presents two arguments in support of a general argument entitled "Oregon Was Prohibited From Unilaterally Overriding or Altering the Terms of the Compact to Eliminate the Compact Election." The following review of the authorities upon which taxpayer relies is organized following taxpayer's headings.

1.   *The fundamental nature of interstate compacts*

Taxpayer begins with many observations regarding the history and role of interstate compacts, citing very general and laudatory statements about compacts. Nothing stated by taxpayer is particularly incorrect or objectionable. It is simply not relevant to the issue before the court—whether there is a substantive federal constitutional limitation in addition to the Federal Contract Clause.

The authorities cited by taxpayer are several lower federal court and United States Supreme Court cases, a case from the District of Columbia, two opinions of the Oregon Attorney General and one opinion of the California Attorney General.

The court does not consider as authoritative for this case the law review articles, treatises, or secondary materials cited by taxpayer. Carefully identifying and discussing relevant authority is the most difficult part of this case. The secondary sources are simply too general and often confuse congressionally approved Compacts with those having no congressional approval. For example, one such source upon which taxpayer relies states:

---

[29] It has been said that "the terms compact and contract are synonymous." *Green v. Biddle*, 21 US (8 Wheat) 1, 92, 5 L Ed 547 (1828). However, no authority supports a conclusion that the label of "compact" forecloses examination to see if a contract, in fact and in law, exists. And, if no consideration exists, such that no contract exists, it follows that, labels aside, no compact exists.

"Once entered, the terms of the compact and any rules and regulations authorized by the compact can, to the extent provided in the agreement, supersede any substantive state laws that may be in conflict, including even state constitutional provisions. Under the Compact Clause, the federal questions are the execution, validity, and meaning of federally approved state compacts. A compact controls over a state's application of its own law through the Supremacy Clause and the Contracts Clause of the Constitution."

Caroline N. Broun *et al*, *The Evolving Use and the Changing Role of Interstate Compacts* 22 (2006). As the authors acknowledge, a compact's terms supersede conflicting state laws "to the extent provided in the agreement." There is no basis asserted for finding that a compact without congressional consent is binding if the agreement does not so provide. In the case before this court, no provision of the Compact provides that it supersedes any Oregon law.[30]

The authors continue their discussion as follows:

"The contractual nature of the agreement and its federal standing, *where applicable*, trumps individual state statutory schemes because, through the compact, the member states cede individual state authority in favor of a multilateral resolution to a dispute or in favor of multilateral regulation of an interstate matter."

*Id*. at 23 (emphasis added). The authors' discussion of a compact's federal standing, "where applicable," provides no further support for taxpayer's contention. Here, there is no federal statute at issue. And, although the authors recognize that a compact's "contractual nature" may impact the analysis, this court has found that no such contractual relationship exists.

Taxpayer's brief also suffers from general observations followed by case citations provided without any analysis of the relevancy of the cases. Such discussions and observations simply do not grapple with what case law authority actually holds. The cases cited by taxpayer, and

---

[30] For an example of a compact that expressly provides that it supersedes other law, see discussion of the Interstate Compact for Juveniles below. 22 OTR at 165-67.

often by the department for that matter, tend to be used to support very general statements. Such cases have often been cited by other courts for the same general propositions and the taxpayer also refers to those later cases. The problem is that the foundational decisions in fact do not contain holdings relevant to this case. Rather, the foundational cases are often premised on federal law not relevant to this case. Other foundational cases cited as authority contain only dicta.

In this section of its argument, taxpayer cites federal court cases that address interstate compacts that *were* approved by Congress.[31] Accordingly, they provide no authority for the analysis of a compact *not* approved by Congress when, as here, the issue is binding restrictions on state legislative action arising from prior legislative contracts.

The District of Columbia case cited by taxpayer is *In re O. M.*, 565 A2d 573 (DC 1989). Taxpayer cites this case as "holding subsequent conflicting state law cannot alter compact." (Ptfs' Mot Summ J at 19.) *In re O. M.* involves no such holding.

The compact in question was the Interstate Compact on Juveniles (ICJ). Several observations about the ICJ and the decision in *In re O. M.* are appropriate:

(1)   The ICJ recognizes that it was "authorized" by Congress. *See* 4 USC § 112.[32] In addition, Congress in its

---

[31] *Hinderlider v. La Plata Co.*, 304 US 92, 104, 58 S Ct 803, 82 L Ed 1202 (1938); *Dyer v. Sims*, 341 US 22, 24, 71 S Ct 557, 95 L Ed 713 (1951); *Hess v. Port. Authority Trans-Hudson Corporation*, 513 US 30, 42, 115 S Ct 394, 130 L Ed 2d 245 (1994); *KMOV TV, Inc. v. Bi-State Development Agency*, 625 F Supp 2d 808, 811 (ED Mo 2008); *C.T. Hellmuth v. Washington Metro. Area Trans.*, 414 F Supp 408, 409 (D Md 1976); *Texas v. New Mexico*, 482 US 124, 128, 107 S Ct 227, 996 L Ed 2d 105 (1987); *Doe v. Ward*, 124 F Supp 2d 900, 914-15 (WD Pa 2000); *Alcorn v. Wolfe*, 827 F Supp 47, 52 (DDC 1993); *Nelson v. Cent. Interstate Low-Level Radioactive*, 902 F Supp 1046, 1049 (D Neb 1995).

[32] Although the *In re O. M.* court did not recognize this point, under *Cuyler* this makes the compact in question in *In re O. M.* a congressionally approved compact. The text of the ICJ recognizes that 4 USC § 112 is Congressional authorization of the ICJ. ICJ, Art I, *available at* http://www.juvenilecompact.org/LinkClick.aspx?fileticket=b9nFo9GaUco%3d&tabid=654&portalid=5; *see* ORS 417.030, Art I, 4 USC § 112 was the federal authorization found to be advance approval of the Compact at issue in *Cuyler*.

role as legislature for the District of Columbia directed that the ICJ be adopted by the District. Pub L 91-358, § 402, 84 Stat 478, 658 (1970) (codified at D.C. Code § 32-1102 (1988)).

(2)   The court concluded that in adopting D.C. Code section 32-1104 Congress had commanded enforcement of the ICJ. *Id.*

(3)   The court discussed two analyses pursuant to which the later adopted procedural statute that was asserted to be inconsistent with the ICJ was not even applicable.

(4)   Article XIII of the ICJ provides that its provisions supersede all state law other than constitutions and other compacts.

(5)   The ICJ is replete with mandatory language including, in Article XIII for example, that all rules and by-laws of the Interstate Commission created by the ICJ are "binding upon the compacting states."

(6)   Oregon has, by statute, adopted the provisions of the ICJ and a statute requiring Oregon courts and administrative agencies to enforce the ICJ. *See* ORS 417.030; ORS 417.080.

There may be some doubt as to whether the ICJ is congressionally approved. If the compact in *In re O. M.* was congressionally approved, the case is not relevant here. If the Compact was not federally approved, it is a binding legislative contract expressing a clear intention to supersede other legislation. As discussed above, the Compact is not such a legislative contract.

Nor are the opinions of the Oregon and California Attorneys General persuasive. The 1973 Oregon opinion, 36 Op Atty Gen 297 (1973), relates to a compact as to which Congress took action. Pub L 92-280, 86 Stat 126 (1972). That congressional action may only have related to legislative action by Congress for the District of Columbia. However, the compact in question, unlike the Compact here, was supported by contractual consideration—a restriction on withdrawal of one year advance notice.

The 1965 Oregon opinion related to legislation that did not become law. 32 Op Atty Gen 146 (1965). The proposed compact would have required congressional consent. In addition, withdrawal would have been allowed only upon approval of all states and Congress. The opinion on this matter is irrelevant to the discussion in this case.

The California opinion concerned whether California could withdraw from the Commission created under the Compact other than through repeal of the Compact. 80 Op Cal Atty Gen 213 (1997). That question is not present in this case. The opinion also concluded that California was liable for financial charges and obligations incurred prior to withdrawal. As discussed above, that conclusion is properly understood as based on a *quantum meruit* or quasi contract basis. It does not support the conclusion that the Compact is a binding legislative contract under Oregon law.

2.   *The principle of the precedence of interstate compacts over other state law applies regardless of congressional consent*

This assertion of taxpayer is its most important with respect to what is at issue in this case, because the Compact with which we are concerned did not receive Congressional approval, and did not need such approval. The cases upon which taxpayer relies therefore deserve to be addressed very carefully. As will be seen, quotations and borrowed phrases from various cases can easily suggest answers to the important questions in this case that simply are unsupportable. Care is absolutely necessary because the issue is what limitations exist on the legislative body of a sovereign state. The Contract Clauses, assuming a contract exists, are the limits. Careless citations and observations by litigants and courts cannot support the existence of another limit on state legislative action.

a.   *McComb v. Wambaugh*

Taxpayer first relies upon *McComb v. Wambaugh*, 934 F2d 474 (3d Cir 1991). The compact in question there was the Interstate Compact for the Placement of Children (ICPC), a compact which did not receive congressional approval. The opinion made general observations about

compacts, never distinguishing between those with congressional approval and those without such approval. The court also observed in language quoted by taxpayer:

> "Nevertheless, uniformity of interpretation is important in the construction of a Compact because *in some contexts* it is a *contract* between the participating states. *See Dyer v. Sims*, 341 US 22, 27-28, 71 S Ct 557, 95 L Ed 713 (1951). *Having entered into a contract*, a participant state may not unilaterally change its terms. A [c]ompact also takes precedence over statutory law in member states."

*Id.* at 479 (emphasis and alteration added). The following observations are important to a consideration of the authoritative, or even persuasive, value of *Wambaugh*:

(1)    No party in the case raised or challenged the status of the ICPC as a contract binding on future legislatures of member states. At issue was the applicability of a rule of the ICPC administrative organization regarding the applicability of the ICPC in out-of-state placements of children with parents.

(2)     In particular, the question was whether the ICPC and rules issued pursuant to it acted to create a special relationship between two persons such that a special duty in tort arose. The case involved legal inferences based on the ICPC, not whether the ICPC bound future legislatures.

(3)    The court in *Wambaugh* concluded that the ICPC, properly construed, did not even apply to the facts it had before it.

(4)    The citation by the *Wambaugh* court to *Dyer v. Sims* adds nothing. First, the compact at issue in *Dyer v. Sims* was approved by Congress and therefore, for purposes of enforcement, did not need to have contractual force under state law. Second, the observation for which *Dyer v. Sims* is cited is only that *in some contexts a compact is a contract among states*. That observation hardly helps determine the issue of *whether, in this case, the Compact was a contract sufficient to bind future Oregon legislatures*.

The statements from *Wambaugh* upon which taxpayer principally relies are therefore dicta and in no way helpful to the task before this court, even though this court

is also presented with a compact for which no congressional approval has been obtained.

### b.  *Arizona Dept. of Economic Sec. v. Leonardo*

Taxpayer then cites *Arizona Dept. of Economic Sec. v. Leonardo*, 200 Ariz 74, 22 P3d 513 (2001), indicating that it overruled *Wambaugh* on other grounds. Of course *Leonardo* could not, and did not, overrule a federal court decision. What *Leonardo* did do was express disagreement with the conclusion reached in *Wambaugh* regarding whether the ICPC applied to the situation of placement of a child with an out-of-state parent. As to *Leonardo*, it is appropriate to observe:

(1)   The analysis of the court there is, again, complete dicta as no party challenged the status of the ICPC as an enforceable contract. The argument was only as to interpretation of provisions of the compact.

(2)   No question was presented regarding the ability of a member state to legislate in ways inconsistent with the compact.

(3)   The ICPC has terms that are much more clearly contractual than those in the Compact. Consideration is also clearly present in the form of a requirement of two years advance notice before withdrawal. *See* ORS 417.200 (ICPC as adopted in Oregon). From the discussion of consideration and the principles found in the *Restatement (Second) of Contracts* section 77, comment b, illustration 5, it is clear that the ICPC differs fundamentally from the Compact in terms of the existence of consideration.[33]

The status of *Leonardo* as authority for the resolution of problems in this case is no better than that of *Wambaugh*; that is, not even persuasive.

### c.  *General Expressways, Inc. v. Iowa Reciprocity Bd.*

Taxpayer next relies upon *General Expressways, Inc. v. Iowa Reciprocity Bd.*, 163 NW2d 413 (Iowa 1968). Two observations about this case are relevant.

---

[33] *See* 22 OTR at 141-44.

(1)   This case is of no precedential or persuasive value for the simple reason that: "[i]n their answer defendants admitted that the State of Iowa entered into a valid and binding contract when it became a party to the compact[.]" *Id.* at 418.

(2)   The compact at issue in *General Expressways*, the Uniform Vehicle Registration Proration and Reciprocity Agreement, permitted withdrawal by member states, but only after giving of 30 days notice. Like the ICPC at issue in *Leonardo*, it is clear that the compact in *General Expressways* also differs fundamentally from the Compact in terms of the existence of consideration by virtue of the notice provision on withdrawal.[34]

*General Expressways* can hardly be helpful for this court, presented as it is with a complete disagreement as to whether a compact is a binding and enforceable contract.

### d.   *In re O. M.*

Taxpayer next relies upon *In re O. M.*, 565 A2d 573 (DC 1989), which for reasons discussed above, is of no applicability or assistance in addressing the problems in this case.

### e.   *In re C. B.*

Taxpayer next relies upon *In re C. B.*, 188 Cal App 4th 1024 (2010). This case is essentially of the same character as *Leonardo* and *Wambaugh*. It was a dispute about the interpretation of the scope of the ICPC. *See id.* at 1031. However, none of those cases involved a difference among the parties about the contractually binding status of the ICPC. *In re C. B.* therefore is of no relevance in the resolution of this case.

### f.   *Alcorn v. Wolfe*

Taxpayer next relies upon language in *Alcorn v. Wolfe*, 827 F Supp 47 (DDC 1993) for the proposition that

---

[34] See discussion under *Leonardo* above, 22 OTR at 169, and discussion of consideration in statutory contracts under the *Restatement*, 22 OTR at 141-45.

compacts bind state legislatures. The following observations are relevant:

    (1)   The compact in question in *Alcorn* was approved by Congress and therefore had the status of federal statutory law. *See id.* at 52.

    (2)   What the court said was:

> "In light of the Supremacy Clause to the United States Constitution, Art. VI, cl. 2, and because compacts are analogous to contracts between states, *see Texas v. New Mexico*, 482 US 124, 128, 107 S Ct 2279, 2283-84, 96 L Ed 2d 105 (1987), the terms of the MWAA compact cannot be modified unilaterally by state legislation and take precedence over conflicting state law. *See McComb v. Wambaugh*, 934 F2d 474, 479 (3d Cir 1991); *Kansas City Area Transp. v. State of Mo.*, 640 F2d 173, 174 (8th Cir 1981)." *Id.* at 52-53.

    (3)   As already discussed above, *Alcorn*'s citation to *Wambaugh* adds nothing helpful to the analysis. The statements made in *Wambaugh* regarding the nature of compacts lacking congressional approval are dicta with respect to a problem of the status of a compact as a limitation on a future legislature.

    (4)   *Alcorn* refers to the case of *Texas v. New Mexico.* The observation in *Texas v. New Mexico* that compacts are analogous to contracts was made in the context of the question whether money damages could be awarded against a state that had violated a compact approved by Congress. The court said:

> "There is nothing in the nature of compacts generally or of this Compact in particular that counsels against rectifying a failure to perform in the past as well as ordering future performance called for by the Compact. By ratifying the Constitution, the States gave this Court complete judicial power to adjudicate disputes among them, *Rhode Island v. Massachusetts*, 37 US (12 Pet) 657, 720, 9 L Ed 1233 (1838), and this power includes the capacity to provide one State a remedy for the breach of another."

*Texas v. New Mexico*, 482 US at 128. *Texas v. New Mexico* does not deal with a compact that has not received the approval of Congress. It therefore is not relevant authority on the effect, if any, on state legislatures of nonapproved compacts.

(5)   *Alcorn*'s citation to *Kansas City Area Transp.* is to a case in which the compact was approved by Congress. *Kansas City Area Transp.*, 640 F2d at 174. Additionally, the court in that case applied a rule that, even when a compact has received congressional approval, state legislation is not prohibited but, in fact, allowed when the state legislation is in approbation of the compact and not in reprobation of the compact. *Id*. The court in *Kansas City Area Transp.* found the state legislation there to be in approbation of the compact. *Id*. The court therefore had no occasion to address limitations on states when no approval by Congress was involved.

g.   *Texas v. New Mexico*

Taxpayer itself cites *Texas v. New Mexico*. As the discussion of *Alcorn* above shows, *Texas v. New Mexico* involved a compact approved by Congress and a question of proper remedies for noncompliance. It is not an authority applicable to this discussion.

h.   *C. T. Hellmuth v. Washington Metro. Area Trans.*

Next, taxpayer cites *C. T. Hellmuth v. Washington Metro. Area Trans.*, 414 F Supp 408 (D Md 1976). This was a case involving a compact approved by Congress, *id*. at 409, and therefore irrelevant to this section of taxpayer's argument—that compacts that have not been approved by Congress limit state legislatures.

i.   *Doe v. Ward*

Taxpayer next cites *Doe v. Ward*, 124 F Supp 2d 900 (WD Pa 2000). Once again, taxpayer is citing a case involving a compact approved by Congress for its proposition that compacts without such approval are binding on legislatures of states in the absence of all elements necessary to form statutory contracts. *Id*. at 912. That is simply not the law. Additionally, the case is one involving only construction of compact language and not the question of the existence of a statutory contract limiting the actions of state legislatures.

j.   *Entergy Arkansas, Inc. v. Nebraska*

Taxpayer finally cites *Entergy Arkansas, Inc. v. Nebraska*, 358 F3d 528 (8th Cir 2004). Yet again taxpayer, by citing this case, suggests it is relevant to the issues

before this court. It is not. It involves a compact approved by Congress that fairly bristles with binding contract language such as statements that all law of member states inconsistent with the compact is declared null and void. *Id.* at 534; Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub L 99-240, § 222, 99 Stat 1842 (codified as a note to 42 USC 2021d) (Central Interstate Low-Level Radioactive Waste Compact, Art VI, § c).

### 3. *Conclusion as to taxpayer's assertions on compact clause as source of limitation on state legislatures*

At the end of the day, and it has been a long but necessary "day" of carefully examining "authority," one conclusion is abundantly clear. Notwithstanding general statements found in cases and often repeated, there is simply no authority for the proposition that under the Compact Clause, an independent limitation on state legislatures exists when no approval by Congress was necessary or given. Limitations do exist in such cases. However, as discussed much earlier in this opinion, in the absence of approval of a compact by Congress, they derive from either the state or federal Contract Clauses. The label "compact" does not have a talismanic power to create a substantive limitation on the actions of state legislatures.

## V.   CONCLUSION

The actions of the legislature of Oregon in adopting ORS 314.606 were for the purpose of disabling the Compact Election. That legislative action violated no procedural or substantive provision of the Oregon Constitution. It violated no provision of federal statutory law. It did not violate the Compact Clause or Federal Contract Clause.

The provisions of ORS 314.606 are applicable to taxpayer such that its claim for a refund of tax was properly and validly denied by the department. The motion of the department is granted and that of taxpayer is denied.[35] Now, therefore,

---

[35] ORS 305.765 would have been a potential issue if taxpayer prevailed on its motion. As it has not prevailed, that issue is moot.

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment is denied; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is granted.